# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1244

CARNES COMPANY,

*Plaintiff-Appellee*,

v.

STONE CREEK MECHANICAL,
INCORPORATED,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02 C 208—**Barbara B. Crabb**, *Chief Judge.*

———————

ARGUED NOVEMBER 5, 2004—DECIDED JULY 5, 2005

———————

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Carnes Company, a Wisconsin-based manufacturer of heating, ventilation, and air-conditioning ("HVAC") equipment, entered into an agreement to sell "energy recovery units" to Stone Creek Mechanical for use in a Pennsylvania HVAC project on which Stone Creek was the general mechanical contractor. When the parties' relationship unraveled, Carnes commenced this breach of contract action alleging nonpayment on the part of Stone Creek, and Stone Creek counterclaimed for damages caused by Carnes' alleged nonperformance. After a bench

trial the district court found that Stone Creek had breached the contract and awarded Carnes $401,922 in contract damages and $219,614.74 in attorney fees, as provided in the agreement. Stone Creek appeals. We affirm.

## I.  Background

In their appellate briefing the parties present very different versions of the pertinent events that combined to doom their contractual relationship. Carnes' statement of facts traces the district court's factual findings; Stone Creek essentially ignores the district court findings and tells a very different story of the parties' relationship and course of dealing. We view Stone Creek's approach as largely an attempt to retry the case on appeal. This is improper. Findings of fact entered after trial to the court are reviewed under the clearly erroneous standard of review, FED. R. CIV. P. 52(a), and an appellate court oversteps its bounds if it attempts to duplicate the role of the trial court. *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). The party alleging error bears the burden of demonstrating that particular factual findings were clearly erroneous. *Brunswick Leasing Corp. v. Wis. Cent., Ltd.*, 136 F.3d 521, 526 (7th Cir. 1998). In other words, it is entirely improper for us to "try the case *de novo* on the record." *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 332 (1952); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969) ("In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*.").

A finding of fact is clearly erroneous only when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948); *Bowles v. Quantum Chemical Co.*, 266 F.3d 622, 630 (7th Cir. 2001).

If there are two permissible views of the evidence, the trial court's choice between them cannot be clearly erroneous. *Anderson*, 470 U.S. at 574. Where the district court's account of the facts is "plausible in light of the record," we may not reverse it even if we would have decided the case differently, and any reasonable doubts we may harbor should be resolved in favor of the district court's ruling "in light of its greater immersion in the case." *Cent. States, S.E. & S.W. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 910 (7th Cir. 2000). We also afford great deference to the trial court's assessment of witness credibility; indeed, we have stated that a trial court's credibility determination "can virtually never amount to clear error." *Lac du Flambeau v. Stop Treaty Abuse-Wisconsin, Inc.*, 41 F.3d 1190, 1194 (7th Cir. 1994).

The following are the facts as found by the district court after trial: Carnes is incorporated and based in Wisconsin and manufactures HVAC equipment. Stone Creek is a Pennsylvania mechanical contractor.[1] In May 2000 Stone Creek was awarded a contract for the installation of HVAC equipment in three Pennsylvania schools. Stone Creek, initially working through an "independent sales representative" called Chase & Associates, approached Carnes to determine whether Carnes could provide 50 "energy recovery units" for use in the project. In March 2001 Stone Creek sent Carnes a purchase order concerning the manufacture, sale, and delivery of the 50 units for a total price of $640,000. Carnes did not immediately accept Stone Creek's purchase order. Negotiations continued, and Stone Creek asked Carnes to provide warranty information concerning the work Carnes was being asked to perform. On April 5, 2001, Carnes provided Chase with the warranty documentation, which in turn was forwarded to Stone Creek.

---

[1] Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332(a), and the parties agree that Wisconsin law applies.

The warranty documentation was actually titled "Terms, Conditions, and Warranty" and included Carnes' payment terms and conditions: payment must be made within thirty days of invoicing; late payment charges and interest in the amount of 1.5% per month would be assessed; and in the event of nonpayment, Stone Creek would be responsible for paying Carnes' costs of collection, including reasonable attorney fees. The documentation further provided that these payment conditions would be deemed accepted by Stone Creek if there was no objection within five days.

On June 27, 2001, negotiations between Carnes, Stone Creek, and Chase culminated in a letter written that date from Carnes to Stone Creek's president indicating that Carnes agreed to perform a portion of the purchase order and that it was "assigning" another portion of the work to Chase. The letter detailed the aspects of the work Carnes would perform and the amount it would charge ($527,000), and contained a similar breakdown of the work that Chase would perform and the amount that Chase would bill directly to Stone Creek ($113,000). The letter asked Stone Creek's authorized representative to sign and return the letter as an acknowledgment and acceptance of this arrangement or, alternatively, to "please advise immediately if the aforementioned assignment is **not acceptable**. . ." (emphasis in original).

Stone Creek did not notify Carnes of any objection to the proposed assignment of responsibilities between Carnes and Chase. On July 16, 2001, Stone Creek's president, Richard Worth, signed the letter and faxed the signed document to Carnes. However, unbeknownst to Carnes, Worth used correction fluid to "white out" the dollar amounts allocated to Carnes and Chase, respectively. The Carnes employee who received the faxed document filed it without noticing Worth's "white-out" deletions.

The parties thereafter agreed on a production schedule under which Carnes would deliver the first 19 units to

Stone Creek by August 24, 2001. Carnes' agreement to this delivery schedule was contingent upon Stone Creek's payment of an additional expediting charge reflecting the fact that initial negotiations had only contemplated the completion of nine units by this time.

Major stumbling blocks to the amicable completion of the parties' relationship arose almost immediately, and these were resolved with a series of agreements that attempted to keep the project on track. First, it became apparent early on that Chase would be unable to perform all of the tasks it had been assigned under the purchase order acknowledgment. In an attempt to keep the manufacture and delivery of the first 19 units on schedule, Worth assumed several of Chase's tasks himself, including ordering the "curbs, coils and variable frequency fans" needed for production of the units Carnes was manufacturing. Stone Creek also assumed the role of guarantor of payments Chase owed to component suppliers.

Second, several "Invensys controls" and "variable frequency drives" necessary for Carnes to manufacture and ship the 19 units by August 24 did not arrive at Carnes' plant in a timely fashion. The parties agreed to resolve this dilemma with an agreement that Carnes would ship the units without the controls and that Stone Creek would install them itself upon delivery. In exchange Carnes agreed to cancel the expediting charge that had been negotiated in connection with the August 24 delivery date.

Carnes began shipping the units to Stone Creek on August 21, 2001. Invoices sent with the units specified the payment terms Carnes had earlier provided to Stone Creek: payment due within thirty days; late payment interest charges of 1.5% per month; and, in the event of nonpayment, Stone Creek would be responsible for costs of collection, including reasonable attorney fees. Each invoice also contained the following language: "Buyer will be deemed

to have assented to these terms and conditions unless Seller receives written notice of any objection within 5 days of the date Buyer receives this writing[.]"

In early September 2001 Chase began submitting bills to Stone Creek that exceeded the $113,000 allocated to it for its work under the purchase order. In light of Chase's shortcomings in performance to that point, Stone Creek was not pleased with this development. On September 13, 2001, Worth notified Carnes that Stone Creek would not make any payments for the units already delivered until he received engineering drawings representing the units as built (referred to as "as-built submittals"). Carnes sent the submittals by overnight mail that very day, and tracking information on the package indicated that Worth received them on September 14. On October 2, 2001, when no payment had been made on any of Carnes' invoices, Carnes notified Stone Creek that it would cease production of the remaining units until Stone Creek paid for the completed shipments. On October 5, 2001, Stone Creek paid some, but not all, of the outstanding invoices. On October 18, Carnes notified Stone Creek that it would not ship any more units until payment on all outstanding invoices was made.

On October 24, 2001, in an effort to break the impasse, a telephone conference was held between the two principals, Worth on behalf of Stone Creek and Gregory Cichon, Carnes' general manager. The following day Worth wrote to Cichon memorializing the oral agreement reached on the telephone. The letter stated that Stone Creek agreed to pay two of Carnes' outstanding invoices by October 26, 2001, and that in exchange, Carnes agreed to expedite the pending manufacture of "energy recovery unit #2" for delivery by November 5, 2001. Worth also agreed to pay an additional expediting cost in connection with unit #2. Worth's letter also stated that on October 29, 2001, Stone Creek "will receive" final approval from the project engineer of Carnes' as-built submittals and that such approval "will

release for payment any invoices . . . over 30 days old." Payment on such invoices, the letter continued, "will be made on or before November 17th[,] 2001." Finally, Worth's letter stated that "all future invoices for materials as received by Stone Creek Mechanical, Inc. will be paid net 30 days as agreed." The letter made no mention of any agreement (or even a demand by Stone Creek) to offset the invoiced amounts by the cost of the performance deficiencies on the part of Chase or for Stone Creek's purchase and installation of component parts on the units. The letter closed by noting that Worth would be out of the country and unable to communicate with Carnes from October 26 until November 11, 2001.

On October 26, 2001, Carnes received payment on the two invoices as promised in the October 25 letter. Carnes completed its expedited production of unit #2 and shipped it to Stone Creek, together with three other completed units. At this point Carnes had shipped a total of 31 units to Stone Creek, exactly the number needed by Stone Creek to complete the first phase of its contract with the school district in Pennsylvania.

On November 6, 2001, shortly after the units were shipped and during the time Worth claimed to be out of the country, Worth sent a letter to Carnes' parent company, Venturedyne, stating that no further payments would be made to either Carnes or Chase. In the letter Worth claimed that Stone Creek never agreed to any assignment of a portion of the purchase order to Chase; that Carnes (and not Stone Creek) was responsible for paying Chase's invoices; and that Carnes had agreed to assume the costs incurred by Stone Creek for purchasing and installing the component curbs, coils, rails, and drives on the completed units. Attached to this letter were copies of letters purportedly chronicling the history of the parties' relationship and providing support for Stone Creek's decision to cease payment.

The district court found that at least five of the attached letters were fabricated by Worth and never received by Carnes. These letters, bearing various dates during July-August 2001, ostensibly indicated agreements between the parties that Carnes would be responsible for the cost of components purchased and installed by Stone Creek; that Carnes would be responsible for the payment of state sales taxes; and that Stone Creek objected to and rejected the payment terms and conditions contained on Carnes' invoices and warranty verifications. The district court found that if these letters had in fact been sent, Carnes never would have built a single unit for Stone Creek.

Carnes received no further payments and shipped no additional units to Stone Creek. Negotiations were attempted but Carnes refused to ship any more units unless its outstanding invoices were paid and advance payment was made for any future shipments. No agreement was ever reached and Carnes cancelled the contract on March 7, 2002.

On the basis of the foregoing facts, the district court concluded that: (1) the payment and collection terms and conditions contained in Carnes' warranty verification and invoices formed a part of the parties' agreement; (2) the October 25, 2001, letter from Stone Creek modified the existing agreement and committed Stone Creek to pay all outstanding invoices without any of the "offsets" it later claimed and retrospectively attempted to document via the fabricated letters; (3) Stone Creek breached the modified agreement when it failed to make payments as agreed in the October 25 letter; (4) Carnes acted within its rights when it ceased shipping product to Stone Creek after the breach; (5) under the modified agreement Carnes had no responsibility for the portion of the original purchase order assigned to Chase; (6) Carnes did not repudiate the contract when it demanded full payment and refused to make deductions for cost overruns occasioned by Chase's failure

to perform its portion of the project; and (7) there was no language in the October 25 letter conditioning Stone Creek's liability for payment on approval of Carnes' engineering drawings by the project engineer.

As a preface to its conclusions on these issues, the district court went to great pains to unambiguously declare that Worth's testimony was not credible and that the evidence was "irrefutable" that he fabricated the letter attachments to his November 6, 2001, letter to Venturedyne. The court cited several items of evidence supporting these findings, including: (1) discrepancies in fax headings and page numbers on the letters; (2) Worth's surreptitious use of correction fluid to delete portions of Carnes' June 27 letter; (3) numerous occasions on which Worth promised payments to Carnes that were never forthcoming; (4) Worth's false representation in the October 25 letter that he would be out of the country until *after* the date on which Carnes would ship the final four units needed to complete the first phase of the project; (5) the fact that he had been preparing the November 6 letter to Venturedyne while simultaneously assuring Carnes that he would make payments if the final four units were shipped; (6) the fact that he did not send the November 6 letter until after he was aware that the four units had been shipped; and (7) a boast he had made to Carnes' manufacturer's representative that he "says one thing and then does another." In addition, the district court held that Worth testified falsely in a number of respects, including denying that Stone Creek had received the information about contract terms from Carnes through Chase, when the evidence established that Chase had forwarded the information.

The court awarded damages in the amount of $231,930.17, plus interest at the rate of 1.5% per month, for the units Stone Creek received but never paid for. The court also awarded $169,992.19 for units that had been manufac-

tured but not shipped and which Carnes could not resell, as well as $219,614.74 in attorney fees.

## II. Discussion

### A. Carnes' Terms and Conditions

Stone Creek argues that the district court erred in finding that Carnes' payment and collection terms (including the interest and attorney fees provision) were incorporated into the parties' agreement. The district court held that the terms were binding on Stone Creek because Stone Creek had been fully apprised of and accepted (by failing to object to) these terms prior to Carnes' formal acceptance of the purchase order in its letter of June 27. As noted above, Carnes sent Stone Creek its "Terms, Conditions, and Warranty" on April 5, 2001, and this document stated in relevant part:

> This writing constitutes the complete and exclusive statement of the terms and conditions of sale of the products and/or services described herein, and Seller's obligation to sell is expressly conditioned upon assent to these terms and conditions. Buyer will be deemed to have assented to these terms and conditions unless Seller receives written notice of any objection within 5 days of the date Buyer receives this writing . . . .

Stone Creek argues that because this document was provided to Chase, not Stone Creek, the district court's finding that Stone Creek was aware of Carnes' terms was clearly erroneous. We disagree. First, Stone Creek, not Chase, requested Carnes' warranty information. Indeed, Carnes' warranty verification was required by Stone Creek under the terms of the purchase order, and Stone Creek's request for the information was prompted by a demand for it from the project engineer. The document was passed from Carnes to Chase with the understanding that it would be

forwarded to Stone Creek in compliance with the latter's request, and the district court specifically discredited Worth's testimony that Stone Creek had not received information that Carnes transmitted to it through Chase. In addition, there is no evidence that Stone Creek was forced to make a second request for warranty verification. Finally, one of the letters the district court found to have been fabricated by Worth included a statement to the effect that Stone Creek did not accept Carnes' "Terms, Conditions and Warranty[2]." If Stone Creek had never received the terms-and-conditions document, Worth would not have attempted to disclaim it, even in a letter prepared sometime after its purported date of mailing. The fact that this letter sought to affirmatively disavow any acceptance of Carnes' payment terms is evidence that Stone Creek considered itself bound in the absence of a falsified document rejecting the conditions.

Stone Creek also argues that it is not "reasonable" to hold it to Carnes' payment terms because the "Terms, Conditions, and Warranty" document was provided in response to Stone Creek's request for warranty verification alone. Stone Creek offers no authority for the proposition that a contractual term cannot be incorporated into an agreement in this way. In any event, the district court properly held that Carnes' payment terms and conditions are among those "additional terms" that are customarily included in invoices and considered incorporated in the parties' contract unless certain exceptions, not applicable here, apply. *See* WIS. STAT. § 402.207; *Advance Concrete Forms, Inc. v. McCann Constr. Specialties Co.*, 916 F.2d 412, 415 (7th Cir. 1990) (applying Wisconsin law); *Mid-State Contracting, Inc. v. Superior Floor Co.*, 655 N.W.2d 142, 145 (Wis. App. 2002).

---

[2] This letter was dated July 10, 2001, and Stone Creek has not taken issue with the district court's conclusion that Worth fabricated this letter after the fact.

### B. Modification of the Contract

Stone Creek next contends that the district court erred in finding that the parties' agreement was modified by Worth's October 25, 2001, letter. Whether a contract has been modified is a question of fact subject to the clearly errone- ous standard of review. *Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir. 1995) (applying Wisconsin law); *Kohlenberg v. Am. Plumbing Supply Co.*, 263 N.W.2d 496, 500 (Wis. 1978). The existence of an agreement modifying a previous contract is "established in the same way as any other contract." *Kohlenberg*, 263 N.W.2d at 500. The acts relied upon to modify a prior con- tract must be unequivocal in character, and acts that are ambiguous as to whether a modification was intended are not sufficient to establish a modification. *Am. Suzuki*, 65 F.3d at 1386 (citing *Nelsen v. Farmers Mut. Auto Ins. Co.*, 90 N.W.2d 123, 134 (Wis. 1958)). While the effect of a modification may be the creation of a new contract, that contract consists of not only the new terms agreed upon but those terms of the original contract which were not modi- fied. *Estreen v. Bluhm*, 255 N.W.2d 473, 479 (Wis. 1977).

In the face of its burden to demonstrate clear error, Stone Creek argues only that the October 25 letter "merely set forth the parties' agreement regarding payment of the invoices Carnes' asserted were past due, and nothing more." But the evidence supports the conclusion that the letter was intended as far more. At the time, Carnes was accusing Stone Creek of breaching the agreement and was with- holding shipments based upon nonpayment. Stone Creek needed four additional units to complete the first phase of its contract with the school district and was required to make concessions in order to break the parties' impasse and induce Carnes to ship the additional units. The agreements memorialized in the October 25 letter specified that Stone Creek would pay Carnes for the two oldest invoices immedi- ately, get current on other outstanding invoices within a

few weeks, and pay invoices on additional units to be shipped on the original thirty-day terms, in exchange for Carnes' promise to expedite the manufacture of unit #2 and ship it on or before November 5, 2001.

The district court properly concluded that Carnes' agreement to permit Stone Creek to pay in this manner and to expedite the manufacture of unit #2 in exchange for Stone Creek's promise to adhere to the specified payment schedule was a modification of the contract. Stone Creek has not demonstrated that this finding was clearly erroneous.

### C.  Breach and Repudiation

Stone Creek takes issue with the district court's conclusion that it breached the terms of the modified contract when it refused to make any payments after October 26, 2001. Whether Stone Creek breached the terms of the modified contract requires an interpretation of the modified contract, which is a question of law that we review *de novo*. *Designer Direct, Inc. v. DeForest Redevelopment*, 313 F.3d 1036, 1041 (7th Cir. 2002) (applying Wisconsin law). Stone Creek's argument flows from language in the October 25 letter stating that "Stone Creek . . . will receive on 10/29/01 final approval of the submittal information[.] The approval of this information will release for payment any invoices . . . over 30 days old. Payment for these invoices will be made on or before November 17th[,] 2001."

Based on this language, Stone Creek argues that it did not breach the modified contract because it only promised to pay if and when the project engineer approved Carnes' submittals. Apparently the project engineer never actually gave such approvals, although the record does not elaborate as to why this is so. The district court examined the language of the October 25 letter and concluded that there was no such condition attached to Stone Creek's promise to pay, and we agree with this interpretation. The letter pre-

sents the approvals as a *fait accompli*, not as a condition
that may or may not occur and upon which Stone Creek's
obligation to pay depends. The letter presents the approval
issue as an assurance to Carnes that payment will be
forthcoming very soon, and even promises a date certain by
which payment will be made. The district court correctly
concluded that Stone Creek breached the modified contract.

Stone Creek argues that Carnes engaged in an anticipa-
tory repudiation of the contract when Cichon notified Worth
that Carnes was not responsible for cost overruns associ-
ated with Chase's nonperformance and that Carnes was not
responsible for tasks assigned to Chase under the purchase
order. Anticipatory repudiation of a contract occurs "when
either party repudiates the contract with respect to a
performance not yet due, the loss of which will substantially
impair the value of the contract to the other." WIS. STATS.
§ 402.610 (UCC 2-610). In order to constitute an anticipa-
tory repudiation of a contract, there must be a definite and
unequivocal manifestation of intention on the part of the
repudiator that he will not render the promised perfor-
mance when the time fixed for it in the contract arrives.
*Wis. Dairy Fresh, Inc. v. Steel & Tube Prods. Co.*, 122
N.W.2d 361, 367 (Wis. 1963).

We find no merit to Stone Creek's anticipatory repudia-
tion argument for several reasons. First, the evidence does
not support Stone Creek's position that Carnes had ac-
cepted responsibility for the cost overruns attributable to
Chase under the original purchase agreement, much less
the agreement as modified in the October 25 letter. From
the very beginning of the parties' relationship, Stone Creek
assumed duties that had been assigned to Chase under the
original purchase agreement, such as ordering the "curbs,
coils and variable frequency fans" and guaranteeing Chase's
payments to suppliers. Prior to the shipment of the final
four units needed to complete phase one of the project,
Stone Creek never suggested to Carnes that these tasks,

assigned to Chase, were actually Carnes' responsibility. Not once did Stone Creek apprise Carnes of the costs it was incurring as a result of Chase's inability to perform its assigned tasks. Not once did Stone Creek suggest to Carnes that it would be claiming an offset against Carnes' invoices for cost overruns incurred by Chase or for costs incurred by Stone Creek for having to assume Chase's responsibilities. To the contrary, the evidence supports the conclusion that it was not until November 6, 2001, *after* he had unambiguously promised full payment and *after* Carnes shipped the four units in compliance with the modified agreement that Worth first indicated that he considered Carnes responsible for these costs and would make no further payments to Carnes as a result. Indeed, the district court held that Worth's November 6 letter attempted to prove an understanding between the parties as to Carnes' responsibility for Chase's nonperformance only by resorting to falsified documents ostensibly evidencing that this was the agreement all along. In short, the evidence fully supports the conclusion that Worth placated Carnes with promises of full payment until he had gotten what he needed, and only then did he raise the issue of offsets by resorting to fabricated documents.

Stone Creek's second basis for arguing that Carnes either breached or repudiated the contract is that *after* Worth sent the November 6 letter indicating that no future payments would be forthcoming, Carnes refused to ship any more product in the absence of the payment promised in the October 25 letter as well as advance payment for any future shipments. We agree with the district court's conclusion that far from being a repudiation of the contract by Carnes, the refusal to ship was a legally justifiable response to Stone Creek's repudiation of the contract in its November 6 letter.

First, there can be little doubt that Worth's November 6 letter, coming directly on the heels of the October 25 letter

setting forth the modified payment-and-delivery schedule, was a repudiation of the contract by Stone Creek. The November 6 letter unequivocally states that "[n]o further payments of any kind will be made to Carnes Company" until Carnes picked up the cost of Chase's deficient performance. This plainly is a manifestation of Stone Creek's intention not to perform. *Wis. Dairy Fresh*, 122 N.W.2d at 367. At this point Carnes could properly treat the contract as having been repudiated. In addition, Carnes' response to the November 6 letter was consistent with its rights under WIS. STATS. § 402.609(1) (UCC 2-609):

> When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until the demanding party receives such assurance may if commercially reasonable suspend any performance for which the demanding party had not already received the agreed return.

When Carnes received the November 6 letter indicating that no payments would be made, it had more than ample grounds for insecurity as to Stone Creek's performance under the terms of the modified agreement. Carnes' response, to suspend any performance until adequate assurances of performance were forthcoming, was commercially reasonable in light of the history of the parties leading up to that point.

Accordingly, the evidence supports the district court's conclusion that Stone Creek—not Carnes—breached the parties' modified agreement. The judgment of the district court is AFFIRMED.

No. 04-1244 17

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*