In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-2005

TROVARE CAPITAL GROUP, LLC,

*Plaintiff-Appellant,*

*v.*

SIMKINS INDUSTRIES, INC., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 3133 — **Robert W. Gettleman**, *Judge.*

ARGUED SEPTEMBER 15, 2014 — DECIDED JULY 23, 2015

Before FLAUM, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Trovare Capital Group, LLC ("Trovare") sought to purchase an affiliated group of family-owned companies (collectively "Appellees"). The parties executed a Letter of Intent ("LOI") that previewed their negotiations toward the sale. The LOI included a provision requiring Appellees, if they terminated negotiations in writing before a certain date, to pay Trovare a breakup fee. Trovare alleged that Appellees intentionally scuttled the deal prior to

the termination date, and then engaged in sham "negotiations" to avoid paying the breakup fee. After a bench trial, the district court concluded that Appellees had not terminated negotiations before the termination date, and that Trovare was therefore not entitled to the breakup fee. Trovare appeals that judgment. We affirm.

## I. BACKGROUND

This diversity case involves a failed business transaction between Appellees and Trovare. Appellees are an affiliated group of family-owned enterprises that manufacture and import cardboard boxes.[1] At the relevant times, Leon Simkins was the controlling shareholder of the businesses. Randy Cecola was Trovare's sole member.

After decades at the helm, Simkins began to look toward retirement. Because none of his children were interested in running the family business, Simkins sought a buyer for the companies. Appellees engaged Mesirow Financial, Inc. ("Mesirow") to act as broker, and through Mesirow, Trovare expressed interest in the purchase. After a lengthy negotiation, Trovare and Appellees executed the LOI on May 23, 2007. The LOI set forth the parties' intention to negotiate an asset purchase agreement ("APA") that would govern the sale. The parties then attempted to negotiate the APA over a period of months.

The majority of the LOI was explicitly nonbinding, but it did include several binding terms. At issue here, Paragraph

---

[1] The affiliated companies are Simkins Industries, Inc., Harvard Folding Box Co., Inc., Linden-Summer Realty Co., Inc., and South Union Company, Inc.

14, which was binding, provided that "[i]f … the Seller provides to Buyer written notice that negotiations toward a definitive asset purchase agreement are terminated, then Seller shall pay Buyer a breakup fee of two hundred thousand dollars ($200,000)." In another, nonbinding provision, the LOI set a "termination date" of September 30, 2007, after which time neither party would be obligated to pursue the sale.

The parties engaged in protracted and contentious negotiations following the LOI's signing. On August 21, 2007, over a month before the September 30 termination date, Trovare sent Appellees a letter demanding payment of the $200,000 breakup fee. Trovare alleged that Appellees had internally decided that they no longer wished to pursue the sale, and therefore had terminated negotiations. All parties agree that Appellees never issued a written notice of termination—an event that concededly would have triggered the breakup fee provision of the LOI.

Instead, according to Trovare, in order to avoid becoming liable for the breakup fee, Appellees were at that time engaging in sham, pretextual "negotiations." In doing so, Trovare argued, Appellees were putting forward bad faith communications as a means of providing the appearance of good faith bargaining. Appellees, on the other hand, insisted that *bona fide* negotiations were ongoing, and they reiterated their desire to complete the sale. Following Trovare's demand letter, communications continued to pass between the two parties through November 2007. Ultimately, however, the deal was never consummated.

Trovare continued to demand the breakup fee, and Appellees continued to insist that no termination had occurred before the termination date (and thus that no breakup fee

was owed). Trovare eventually filed suit in the Northern District of Illinois alleging breach of contract, seeking damages in the amount of the $200,000 breakup fee. The district court granted summary judgment for Appellees. We reversed and remanded the case for further proceedings. We concluded that genuine disputes of material fact existed as to two issues: (1) whether Appellees had in fact ended negotiations prior to the termination date; and (2) if so, whether Appellees in bad faith refused to issue a written notice of termination.

On remand, the district court held a bench trial in which it reviewed submissions and heard testimony from multiple witnesses. Much of the testimony concerned the history of communications between the parties. We will not recite the entire lengthy history of those communications; suffice it to say, the negotiations were contentious. We focus here on the areas of discussion that were central at trial and to the district court's decision.

A few topics, which we discuss below, were of particular importance: due diligence; "Phase II" environmental studies ("Phase IIs"); and a "termination email" dictated by Simkins. We treat these in turn.

*A. Due Diligence*

Two nonbinding paragraphs of the LOI referenced the due diligence previewed by the parties. Paragraph 9 specified that:

> Completion of this transaction would be subject to conditions precedent to Buyer's obligations to close as agreed to by the parties, including … completion by Buyer and its advisors of a due diligence investigation

satisfactory to it, in its sole discretion, of the Business'
assets, prospects and other relevant information, in-
cluding validation of relationships with key clients
and approval by Buyer's Board.

Paragraph 10 provided that:

Seller will provide Buyer and its representatives rea-
sonable access to the books, records, financial state-
ments, properties, personnel, key suppliers, and key
customers of the Business. Seller will provide blind
customer order history, volumes and related infor-
mation to Buyer. … Buyer and Seller will coordinate
and mutually agree upon the timing, scope and con-
tent of any customer interaction.

As negotiations proceeded, two types of due diligence
became central to the parties' discussions. First, Trovare
sought to conduct its own diligence. Appellees' Chief Finan-
cial Officer, Anthony Battaglia, testified that he provided
Trovare with "historical financial records for the carton
plants at Simkins Industries, balance sheets, P&Ls, sales by
location … blind customer lists [and] … inventory listings."
He characterized the information provided as "your stand-
ard information that you would use in the due diligence
process." Battaglia also provided both unaudited and audit-
ed financial statements. In addition, Cecola visited all of the
facilities that were implicated in the sale. Trovare indicated,
however, that it wanted to receive customer lists in order to
validate Appellees' relationships with key clients.

Second, Trovare represented to Appellees that in order to
issue a funding commitment letter, the bank that was financ-
ing the non-real estate portion of the transaction would need

to conduct its own diligence. The evidence indicates that, from the outset, Trovare notified Appellees that the purchase would be a financed transaction. Trovare represented that both debt and equity financing were possible avenues that it might pursue to fund the purchase.

Trovare had approached TCF Bank about providing financing for the non-real estate portion of the purchase, and Andrew Harlan, vice president of commercial lending for TCF, testified to the bank's involvement in the deal. Harlan testified that, as a standard practice in this type of transaction, the bank would conduct its own due diligence investigation. Apparently at Appellees' request, TCF prepared a generic field audit list, informing Appellees of the areas of inquiry it would need to examine in its diligence process. One element of that inquiry concerned "customer validation." During that process, the bank would contact existing customers to confirm outstanding debts to Appellees, in order to verify Appellees' accounts receivable representations. Harlan testified that TCF would not have issued a commitment letter or provided financing without conducting its field audit.[2]

At trial, a number of Appellees' witnesses testified that they viewed the diligence requests as excessive. Steve Gadon, Appellees' attorney and primary negotiator,[3] characterized the customer invoice verification as "a fraud audit."

---

[2] Cecola had also himself expressed interest in verifying customer accounts through direct, non-blind customer interaction.

[3] The evidence suggests that another individual, Barry Brant, took over lead negotiating responsibilities in or around September 2007.

He believed that to request such an audit was to intimate that Appellees "were a bunch of crooks."

In addition to Appellees' opinion that the requested disclosures were unreasonable, they were also concerned about revealing the identities of their customers to an entity that they viewed as a competitor. Cecola already owned a business engaged in the cardboard box industry, and Appellees were hesitant to disclose sensitive information before a deal had been reached.

This appears to have left Trovare and Appellees at an impasse: Trovare asserted that it couldn't get a commitment letter without the requested diligence, and Appellees asserted that they wouldn't allow diligence by a competitor without a commitment letter (or perhaps a signed APA). Cecola testified that eventually he dropped his personal request for customer interaction, stating that he was willing to accept his bank's diligence in order to try to secure a deal. The bank's diligence, however, was never completed.

*B. Phase II Studies*

The asset purchase pursued by the parties included a number of manufacturing facilities. Trovare made clear from the outset that it was concerned, unsurprisingly, about potential environmental liability and remediation costs arising from the real estate at issue. Both parties agreed that so-called "Phase I" environmental studies ("Phase Is") would be commissioned and paid for by Trovare. This agreement is memorialized in Paragraph 6 (a nonbinding provision) of the LOI. The Phase Is involved a "paper review" of the real estate at issue. Using public records, the Phase Is aimed to

track the history of the properties, identifying whether there were any areas of potential environmental concern.

Trovare had always maintained that if the Phase Is so indicated, Phase IIs would be necessary. Generally speaking, a Phase II entails the physical inspection of a property, including measures such as soil and water sampling. The LOI is silent on the issue of Phase IIs, so a number of matters remained for negotiation, including financial responsibility for the Phase IIs, timing, and selection of the analyst. Trovare also represented to Appellees that its bank would not provide financing for the real estate without the Phase IIs.

Shortly after execution of the LOI, Trovare completed the Phase Is. The Phase Is indicated that Phase IIs would be necessary for all of Appellees' properties, and Trovare promptly notified Appellees, through Mesirow, of that fact. Battaglia indicated to Trovare that a Phase II study consultant would be selected in mid-June and that studies would begin immediately thereafter. Appellees seem to have made further representations about promptly conducting the Phase IIs, though we need not discuss them at length.

At the same time, however, Appellees were concerned about financial liability that might arise from the results of the Phase IIs. Gadon testified about those concerns at trial. According to him, Appellees would have been required to turn over to the government the results of the Phase IIs. Appellees were concerned that if the Phase IIs (and the relevant statutory regimes) indicated a need for remediation, Appellees would be on the hook for those costs if the deal with Trovare didn't materialize. Both parties opined that such costs might reach into the millions of dollars.

So Appellees, contradicting their earlier statements, began representing to Trovare that they needed to receive at least a conditional showing of financing before they would order the Phase IIs. Gadon testified that "to do it before you know you've got a deal to me seemed to be ludicrous. I wanted to know I had a deal or at least the making of a deal before we spent the money." At least in internal emails, if not external representations to Trovare, Appellees formulated the position that the Phase IIs would not be completed before an APA was signed.

Trovare, on the other hand, represented to Appellees that it would be impossible to secure even a conditional offer of financing without the Phase IIs. Trovare continued to insist that the Phase IIs be completed prior to the signing of the APA. It appears that Trovare did not provide Appellees with any written verification that their real estate lender, whose identity remains unclear, indeed required the Phase IIs. No real estate lender testified at trial. Gadon testified that at some point in the later phases of negotiation, in either August or September, he "did concede and say, okay, we'll do it. I just got tired of arguing about it and said, okay, we'll do a Phase II. We didn't do it, but we got close to it." The Phase IIs were never completed.

*C. The Simkins Email*

On August 2, 2007, Simkins's secretary, Barbara Camera, sent an email to Barry Brant, one of Appellees' advisors and negotiators. The email stated, "Leon just called me and said to tell you that he definitely does not want to go through with the Trovare transaction. He has intentions of operating with his children in charge." Appellees do not dispute that this email was sent, or that Simkins made the statement ref-

erenced in the email. Simkins did not issue a subsequent email or other written communication retracting that statement. Appellees did not communicate the contents of this email to Trovare.

Trovare sees this e-mail as a smoking gun. Trovare argued at trial that it constituted a definitive termination of negotiations between the parties. Trovare argued that communications between the parties after this point proceeded without Simkins's authorization, and therefore were not *bona fide* negotiations.

Brant testified at trial that after giving Simkins a few days to "cool off," he spoke to Simkins about the negotiations. Brant stated that he had assumed Simkins sent the email in anger because something "set him off," likely contentious negotiations following a July 27 conference call with Trovare. He also believed that Simkins was upset as a result of operating under some misconceptions concerning the deal. Brant testified that he expressed his opinion to Simkins that going through with the Trovare deal represented the best financial option for both the Simkins family and the company. Brant testified that after their conversation, he understood that he was to continue negotiating the APA, and that he did in fact continue to negotiate on Simkins's behalf.

Gadon also testified that he communicated with Simkins following the email, which had been forwarded to him by Brant. He outlined to Simkins the reasons why Simkins should continue to pursue the sale to Trovare. Gadon testified that after those communications, it was his understanding that he still had the authority to negotiate on Simkins's behalf, and that he did so.

At the conclusion of the trial, the district court found in favor of Appellees. It concluded that negotiations continued up to and beyond the September 30 termination date, and that Appellees participated in those negotiations in good faith. Therefore, the court held, Appellees had not terminated negotiations, and Trovare was not entitled to the termination fee.

## II. ANALYSIS

Following a bench trial, we review findings of fact for clear error. *Levenstein v. Salafsky*, 414 F.3d 767, 773 (7th Cir. 2005). We review mixed questions of fact and law (that do not involve constitutional rights) for clear error. *Id*. A finding of fact is clearly erroneous "only when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 847 (7th Cir. 2005).

This was undoubtedly a close case for the district court, but we conclude that the court did not commit clear error in finding that Appellees continued to engage in *bona fide* negotiations through the LOI's termination date.

All parties agree that Illinois law governs this diversity dispute, and that Paragraph 14 constituted an enforceable contractual obligation between the parties. As we noted in our prior opinion in this case, this paragraph "contained a condition precedent to [Appellees'] enforceable duty to pay the breakup fee: their provision of written notice that negotiations toward a definitive asset purchase agreement [were] terminated." *Trovare Capital Grp., LLC v. Simkins Indus., Inc.*, 646 F.3d 994, 998 (7th Cir. 2011) (internal quotation marks omitted).

Trovare concedes that Appellees did not send a written notice of termination, and therefore did not satisfy the condition precedent to payment of the breakup fee. Trovare relies instead on the implied covenant of good faith and fair dealing imposed on parties to a contract under Illinois law. *See Seip v. Rogers Raw Materials Fund, L.P.*, 948 N.E.2d 628, 637 (Ill. App. Ct. 2011) (stating "[t]he duty of good faith and fair dealing is implied in every contract and requires a party vested with contractual discretion to exercise it reasonably, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of [the] parties" (quoting *Kirkpatrick v. Strosberg*, 385 N.E.2d 781 (Ill. App. Ct. 2008))). This implied covenant applies in circumstances where one party has complete control over the occurrence of a condition precedent, and the covenant seeks to prevent that party from behaving "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 26 (Ill. App. Ct. 2007).

In this case, Appellees had complete control over the occurrence of the condition precedent—providing written notice of termination to Trovare. In order to prove a violation of the implied covenant of good faith and fair dealing, Trovare would have to show that Appellees caused the non-occurrence of the condition, so that they would not have to pay the breakup fee. In other words, Trovare must show that Appellees (1) had no intention of completing the deal, but (2) continued sham negotiations, rather than providing written notice of termination. Trovare tries to make the required showing by pointing to several pieces of evidence, which we address in turn.

*A. The Simkins Email*

Trovare argues that Simkins's August 2 email proves the first point, that Appellees had, at least by that date, decided to end negotiations. Trovare argues that any communications that occurred after this date cannot be classified as *bona fide* negotiations, because Simkins's email shows that Appellees had no real intention of seeing them through, particularly as Simkins never retracted his statement expressly in writing. The district court disagreed, and we find no clear error in its conclusion.

In short, the district court credited the testimony of both Brant and Gadon regarding whether negotiations continued after the Simkins email. The court found that "Gadon counseled Mr. Simkins, according to his testimony, which I believe because it makes perfect sense[.] [H]e counseled [Simkins] to calm down, because everybody was frustrated at that point in early August of 2007, and to continue negotiating with the plaintiff, because they had to sell the business." The district court also concluded that "it was really Mr. Gadon and Mr. Brant who sort of filled in all the holes … that painted this picture a lot more clearly to me and convinced me that Simkins never terminated his desire to negotiate an asset purchase agreement."

The district court did not clearly err when it held that Simkins's August 2 email did not spell the end of negotiations or of Appellees' desire to continue them in good faith. We give great deference to a trial court's determination of credibility. *See Carnes*, 412 F.3d at 848 (stating "[w]e also afford great deference to the trial court's assessment of witness credibility; indeed, we have stated that a trial court's credibility determination can virtually never amount to clear er-

ror" (internal quotation marks omitted)). The court found both Brant's and Gadon's testimony credible concerning Simkins's state of mind when he sent the email, his intent to continue negotiations, and the scope of Brant's and Gadon's authority to negotiate on Simkins's behalf. We see no evidence that would mandate a finding of error on that credibility determination.

In addition, circumstantial evidence supports the district court's conclusion. The evidence established that Simkins was aware that communications continued to pass between Appellees and Trovare after the email was sent. He continued to engage Mesirow to broker the deal. And he asked Brant to take over primary responsibility for negotiations in or around September, apparently because negotiations had become either too contentious or too slow with Gadon. Had Simkins intended to terminate negotiations on August 2, we can only assume he would have stepped in to stop negotiations when he saw that they were continuing.

Because we cannot disturb the court's credibility finding, and because the finding is supported by ample record evidence, we find no clear error in the court's conclusions regarding the August 2 email and Simkins's intention to go forward in good faith.

*B. Appellees' Course of Conduct*

Trovare next argues that Appellees' course of conduct makes evident that Appellees had, prior to September 30, decided to end negotiations. Trovare contends that Appellees imposed impossible conditions on Trovare in order to prevent it from securing funding—thereby scuttling the deal. In particular, Trovare contends that Appellees' positions re-

garding due diligence and the Phase IIs made a deal impossible, and that Appellees intended such an outcome.

The district court concluded that Appellees' course of conduct constituted *bona fide* negotiation, not pretextual sham negotiations. Once again, we find no clear error in the court's conclusion.

### 1. Due Diligence

It is undisputed that Appellees refused to provide the full scope of due diligence information that Trovare requested. Trovare argues that Appellees knew that Trovare could not secure financing without the diligence items it requested. So, Trovare argues, Appellees refused to provide that information (imposing an impossible condition) in order to impair Trovare's access to financing. That, in turn, would scuttle the deal. Appellees argue, on the other hand, that they (1) considered Trovare's requests to be unreasonable; and (2) viewed Trovare as a competitor in the cardboard box market, and were therefore particularly sensitive about disclosing information such as customer lists.

First, while some aspects of the due diligence process were described in nonbinding LOI provisions, many of the details remained for further negotiation. Appellees were not required to acquiesce to any and all diligence items requested by Trovare or its lender, so a certain amount of bargaining was undoubtedly expected by both parties.

As events unfolded, Appellees were not satisfied with some of the diligence items that Trovare requested. Gadon testified that he believed that at least the "field audit" portions of Trovare's (or the lender's) requests were excessive and were tantamount to calling Appellees "a bunch of

crooks." Trovare counters by pointing to trial testimony that indicated that other individuals, such as Harlan from TCF Bank, considered the diligence requests to be reasonable. But that testimony does nothing to undermine Gadon's contention that he, negotiating on behalf of Simkins, considered the requests unreasonable.

The district court did not make a factual finding as to whether the diligence requests were reasonable. The court stated that "Appellees provided audited financial statements, and yet Mr. Cecola wanted apparently to verify some of those audited financial statements to actually trace cash receipts into bank accounts and that sort of thing, which I think the seller's people thought was a bit too much." So the district court credited Gadon's testimony that he believed the requests to be unreasonable. That belief constitutes a plausible explanation for why Appellees opposed the scope of Trovare's requests—an explanation other than the supposition that Appellees were stringing along false negotiations.

Second, the district court concluded that Trovare and Appellees were indeed competitors. It "credit[ed] Appellees' evidence that the plaintiff and the defendant were competitors, at least in some of the markets that they competed in." As such, the court concluded that Appellees were justified in their heightened sensitivity to disclosing customer information. The district court concluded that "the defendant in good faith objected to the plaintiff's contacting its customers and employees directly."

In short, the district court credited Appellees' explanations as to why they opposed the scope of Trovare's requested diligence. Necessarily, then, the court rejected Trovare's argument that Appellees refused due diligence requests in

order to scuttle the deal. Instead, the court concluded that "[t]his was something that never got resolved. It might have gotten resolved if they had gotten closer to the negotiation of an agreement." Record evidence supports the district court's conclusions, and we cannot find them to be clearly erroneous.

### 2. Phase IIs

The Phase IIs loomed large both in the parties' negotiations and in the trial testimony. Trovare argues here that, as with the due diligence, Appellees refused to conduct the Phase IIs in order to impair Trovare's access to financing, and thereby scuttle the deal. Appellees argue that they refused to perform the Phase IIs until they received at least a conditional financing commitment. This was in an effort to minimize their financial liability for environmental remediation, should the deal fall through.

The district court's findings on the Phase II issue are not entirely clear. The court did not mention the Phase IIs prior to reaching its holding that no termination had occurred. After concluding that Simkins did not terminate negotiations prior to September 30, the court made the following statement:

> One more word before I finish, and that is about this environmental study issue, which a lot of testimony and evidence was presented. Mr. Cecola testified that his financing bank always demanded the Phase II, and that because he didn't get the Phase II, that frustrated and basically killed his ability to finance the deal.

But Andrew Harlan, who was the banking witness presented by the [defendant], testified, he was at TCF Bank, testified that that bank did not demand a Phase II, because they weren't financing the real estate. So there is a definite inconsistency between that testimony and Mr. Cecola's, which really calls Mr. Cecola's credibility into question.

Trovare argues that this statement by the district court constitutes clear error and calls for reversal. Trovare argues that the court misunderstood either the nature of Harlan's testimony or Cecola's representations and made a clearly erroneous factual finding. As the court itself noted, TCF Bank was not providing the real estate financing, so it did not require the Phase IIs. Cecola never represented that it did. Instead, he represented that *another* bank—the one financing the real estate—demanded the Phase IIs. Therefore, Trovare argues, Cecola's credibility could not properly have been called into question by Harlan's testimony.

We agree with Trovare that Harlan's testimony, as far as we can tell, should have had no impact on Cecola's credibility. However, this statement by the district court does not constitute clear error requiring reversal, for the following reasons. First, it seems to us that the Phase II issue had little or no bearing on the district court's reasoning or conclusion as to termination. The court mentions the Phase IIs after reaching its holding, and we have no reason to believe that the court's "[o]ne more word" influenced its already established view on the question of termination.

Second, Trovare does not establish that the only reasonable explanation for Appellees' refusal to conduct the Phase IIs was a desire to scuttle the deal. Appellees put forward a

plausible explanation as to their reluctance—their possible financial liability for remediation—and Trovare's arguments do not render that explanation implausible.

To be sure, Appellees' actions relative to the Phase IIs give us some pause. At best, Appellees changed their negotiation position regarding the Phase IIs, and at worst, they engaged in misrepresentation about whether the Phase IIs would occur. After Battaglia represented that Appellees would begin the Phase II process, Gadon then represented on multiple occasions that no Phase IIs would be completed until after an APA had been signed. This was a position that Trovare indicated would be a deal-breaker. Gadon also testified, however, that he ultimately "got tired of arguing about it," and indicated that Appellees would do the Phase IIs prior to signing an APA.

The district court credited Gadon's testimony, and Trovare does not establish that the district court was clearly erroneous.

### III. CONCLUSION

In sum, we conclude that the district court did not clearly err when it concluded that Appellees continued negotiations in good faith through September 30, 2007. Accordingly, we AFFIRM the judgment of the district court.