In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 04-1139 & 04-1311

VAN DYKE JOHNSON,

*Plaintiff-Appellant*,

*v.*

STEPHEN DOUGHTY, DOCTOR, JOHN CEARLOCK,
DON HINDERLITER, et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 00 C 3119—**Harold A. Baker**, *Judge.*

ARGUED JANUARY 14, 2005—DECIDED JANUARY 17, 2006

Before RIPPLE, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* Former Illinois prison inmate Van Dyke Johnson sued, *pro se*, three prison doctors and seven prison officials under 42 U.S.C. § 1983, alleging Eighth Amendment violations. Specifically, Johnson claims that the defendants were deliberately indifferent to a serious medical need because they treated his hernia through non-surgical means. During the district court proceedings, Johnson made several motions for counsel under 28 U.S.C. § 1915(e)(1), which the district court denied. The district

court granted summary judgment to some of the prison officials. After a bench trial, the district court entered final judgment in favor of the remaining defendants. Johnson appeals the district court's denial of counsel, grant of summary judgment to some of the defendants, and entry of final judgment in favor of the remaining defendants. We affirm in all respects.

## I.

In 1994, Van Dyke Johnson was convicted of first degree murder in Illinois and was incarcerated by the Illinois Department of Corrections ("IDOC"). In late April or early May 2000, during his imprisonment at IDOC's Graham Correctional Center, Johnson discovered a protrusion in his groin area. Johnson saw a nurse in early May. The nurse told Johnson that he had a hernia. She gave him some Tylenol for his pain and scheduled a doctor's appointment for him.

Two days later, Dr. Don Hinderliter examined Johnson and diagnosed him with an inguinal hernia (i.e., a hernia in the groin area) that, in Dr. Hinderliter's opinion, did not require surgery. Instead, Dr. Hinderliter prescribed a hernia belt/truss to stop the hernia from protruding. After discussing the matter further with Dr. Hinderliter, Johnson requested surgery because of the significant pain he was experiencing. In response, Dr. Hinderliter referred him to Dr. Robert McEntyre, Graham's medical director. This was Johnson's only visit with Dr. Hinderliter.

Johnson saw Dr. McEntyre on several occasions, the first in early June 2000. Upon examination, Dr. McEntyre found the hernia to be "reducible," which means that the hernia can be pushed back inside the body without diffi-

culty. Dr. McEntyre also determined that Johnson's vital signs were all normal and that Johnson did not display any objective signs of acute distress. Further, there was no hint of vomiting or other indications of severe sickness. For these reasons, Dr. McEntyre concluded that the hernia was not "strangulated"—an emergency surgical situation in which the hernia is non-reducible and possibly gangrenous, i.e., causing abdominal tissue decay. Dr. McEntyre further determined that surgery was not required at that point in time. To alleviate Johnson's pain, Dr. McEntyre supplemented the Tylenol and hernia belt by further prescribing Metamucil to relieve Johnson's bowel discomfort. Dr. McEntyre also instructed Johnson to avoid heavy lifting and strenuous activity, and, to that end, Johnson received a lower bunk permit.

Two days after his first visit with Dr. McEntyre, Johnson, on an emergency basis, saw Dr. Stephen Doughty. Dr. Doughty also concluded that the hernia was reducible, and, as Dr. McEntyre had seen Johnson only two days earlier, Dr. Doughty told Johnson to continue following Dr. McEntyre's instructions. This was Johnson's only visit with Dr. Doughty.

Thereafter, Dr. McEntyre monitored Johnson's condition through four additional visits in June and August 2000. Dr. McEntyre's diagnosis of a reducible hernia remained consistent throughout this period. Dr. McEntyre, moreover, did not observe any worsening of the condition that would necessitate surgery.

Other than Johnson's annual physical in October 2000, Johnson did not have or request another doctor's visit

during his time at Graham.[1] In early December 2000, IDOC transferred Johnson to IDOC's Dixon Correctional Center. In March 2005, Johnson was released on parole and is scheduled to be on parole until March 2008.[2]

Displeased with the lack of surgical treatment at Graham, in April 2001 Johnson filed this deliberate indifference action under § 1983, alleging that the treatment of his hernia through non-surgical means constituted cruel and unusual punishment under the Eighth Amendment. This suit pertains only to the seven months, May to December 2000, when Johnson had his hernia at Graham. Besides the three doctors who examined and treated him, Johnson also named seven IDOC and Graham officials as defendants: John Cearlock (health care administrator), Steve Curll (counselor), Billie Greer (assistant warden), Alex Jones (assistant warden), Robert Radmacher (IDOC official), Gilberto Romero (warden), and Donald Snyder (IDOC director). In addition to injunctive relief (i.e., an order mandating that the defendants perform/facilitate hernia

---

[1] Johnson later said Dr. McEntyre performed the physical, but the record does not clearly indicate which doctor handled this exam.

[2] At the bench trial in this case, held in December 2003, Johnson testified that when he got to Dixon he complained about the hernia, but "none of those physicians [at Dixon] have recommended surgery as of today's date." He further explained: "I still have the hernia and I am still going through the same problems that I started out [with]. The only thing different now about it is that . . . I know when to lay down[.] [B]efore I knew what to do I was dumbfounded . . . . If I lay down, the pain will subside because the hernia will go back in." Johnson's appellate attorney informed us that Johnson "did not receive the treatment requested prior to his release."

surgery), Johnson's complaint requested compensatory and punitive damages.[3]

Other than Cearlock, these prison officials' interaction with Johnson was limited to dealing with his grievances and other complaints about the hernia treatment. For his part, Cearlock, as health care administrator, met with Johnson on August 25, 2000, to discuss the situation. Cearlock also happens to be a registered nurse. Deferring to the doctors, Cearlock told Johnson to follow the doctors' instructions and also scheduled an appointment for Dr. McEntyre to reevaluate Johnson's condition (which Dr. McEntyre did shortly thereafter).

Initially, the defendants moved to dismiss the suit. Johnson, proceeding *pro se*, then moved for counsel under § 1915(e)(1). Johnson attempted to secure counsel on his own, but two organizations and five practitioners declined his requests for representation. The district court denied the motion for counsel, reasoning that the matter was not so complex or intricate that an attorney was necessary. Subsequently, the district court denied defendants' motions to dismiss, concluding that they were not entitled to qualified immunity. Johnson then made another request for counsel, which the district court again denied.

Later, when the defendants moved for summary judgment, the district court determined that Johnson's hernia presented a serious medical need. The district court then granted summary judgment for all the prison officials,

---

[3] Although Johnson has been released on parole, his case is not moot because, in addition to injunctive relief, he continues to seek damages. *See DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992).

except Cearlock, reasoning that those defendants were not deliberately indifferent to that need because they took Johnson's medical complaints seriously and reasonably relied upon the doctors' recommendations in handling Johnson's condition.

The district court, however, denied summary judgment with respect to the doctors and Cearlock. As to the doctors, the district court concluded they had failed to refute Johnson's contention that, due to some policy or practice, the doctors would not have recommended surgery for Johnson's hernia regardless of the amount of pain and difficulty it caused. This determination led the district court to further conclude that a factual dispute existed as to whether the doctors' denials of surgery were made in the absence of professional judgment, which, if true, would give rise to deliberate indifference liability (see discussion of legal standard below).

As to Cearlock, the district court could not, at that point in the proceedings, determine if, like the other prison officials, Cearlock deferred to the doctors' medical opinions because, unlike the other key prison officials, Cearlock did not attach a supporting affidavit to the summary judgment motion. The district court, therefore, found that there was a factual dispute as to whether Cearlock, as the health care administrator, bore some responsibility for the doctors' decision not to operate.

The case against the remaining defendants proceeded to a bench trial. Before trial, Johnson filed another motion for counsel, and the district court denied the request. At trial, Johnson testified first. Johnson then examined Cearlock. At the conclusion of Cearlock's testimony, the district court was convinced that Cearlock was not deliberately indifferent to Johnson's condition since Cearlock,

similar to the other prison officials, deferred to the doctors' medical opinions. The district court thus granted judgment mid-trial in favor of Cearlock.

Johnson next examined Dr. McEntyre. After a lengthy exchange between Johnson, Dr. McEntyre, and the district court about when Dr. McEntyre would recommend hernia surgery, Johnson began to repeat some of his questioning, and the district court eventually ended the examination. Then, to move matters along, the district court asked Johnson if he could provide any evidence that Dr. Hinderliter did anything other than see Johnson one time and refer Johnson to Dr. McEntyre. When Johnson responded in the negative, the district court granted judgment for Dr. Hinderliter before he could take the stand. The district court then examined Dr. Doughty to make a record of his interaction with Johnson (i.e., one visit) and concluded the trial.

The district court's final order disposing of the case reiterated its rulings from the bench and ruled in favor of all of the defendants, reasoning that the evidence failed to support any findings of deliberate indifference. Johnson filed motions for reconsideration and for a new trial, each of which the district court denied.

## II.

Johnson appeals and is now represented by counsel. The focal point of Johnson's appeal is the district court's rejection of his motions for counsel. He also challenges the summary judgment and final judgment determinations that went against him.

**A.**

Civil litigants do not have a constitutional or statutory right to counsel in federal court. *See Luttrell v. Nickel*, 129 F.3d 933, 936 (7th Cir. 1997). They, however, may request counsel pursuant to § 1915(e)(1), and then the matter is left to the district court's discretion. *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."); *Luttrell*, 129 F.3d at 936. Consequently, our review under § 1915(e)(1) is limited to the abuse-of-discretion standard. *See Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005); *Luttrell*, 129 F.3d at 936. Furthermore, we evaluate a district court's denial-of-counsel decision "as of the time it was made"—i.e., without the benefit of hindsight. *Hudson v. McHugh*, 148 F.3d 859, 862-63 n.1 (7th Cir. 1998).[4]

In reviewing denials of counsel, the test is *not* whether this court would have appointed counsel if it were in the district court's position. *See Zarnes v. Rhodes*, 64 F.3d 285, 289 (7th Cir. 1995). Even if the reviewing court may have preferred to appoint counsel, that is not its role. Otherwise, such disagreement would always compel appointment.[5] Rather,

---

[4] Because a district court's denial-of-counsel decision is evaluated as of the time it was made, *see Hudson*, 148 F.3d at 862-63 n.1, the fact that the district court granted Johnson's post-trial request for counsel is immaterial to our review of the pre-trial denials of counsel.

[5] For instance, in *Zarnes*, the court held: "Were we to have had the responsibility for the original decision on [the plaintiff's] motion, we may have chosen to appoint counsel to represent her. . . . That is not our role, however, and we cannot hold that the aspects of this case that may trouble us . . . always compel

(continued...)

"overrid[ing]" a district court's denial of counsel is reserved for only "that extreme case in which it should have been plain beyond doubt" that counsel was necessary. *Farmer v. Haas*, 990 F.2d 319, 323 (7th Cir. 1993).

Also, the test is *not* whether "a good lawyer may have done better than [the plaintiff]." *Luttrell*, 129 F.3d at 936. Because if that were the test, "district judges would be required to request counsel for every indigent litigant." *Id.* (quoting *Farmer*, 990 F.2d at 323). Section 1915(e)(1) leaves significant discretion with the district court.

To determine if a district court abused its discretion in denying counsel, we have formulated a two-step inquiry. We first ask: "[G]iven the difficulty of the case, did the plaintiff appear to be competent to try it himself[?]" *Greeno*, 414 F.3d at 658 (quoting *Farmer*, 990 F.2d at 322). If so, our inquiry ends right there. If not, we further ask: "[W]ould the presence of counsel have made a difference in the outcome?" *Greeno*, 414 F.3d at 658 (quoting *Farmer*, 990 F.2d at 322). Reversal is therefore warranted only when the district court's "denial amounts to a violation of due process." *Zarnes*, 64 F.3d at 288; *see also Gil v. Reed*, 381 F.3d 649, 657 (7th Cir. 2004). In other words, a district court will be held to have abused its discretion under § 1915(e)(1) only if the denial of counsel made "it *impossible* for [the plaintiff] to obtain *any sort of justice*." *Farmer*, 990 F.2d at 323 (emphasis added).

Johnson has not met this "exacting standard." *Id.* This case was not overly difficult. Johnson had to show that he had a

---

[5] (...continued)
appointment of counsel. We conclude that the court did not abuse its discretion in determining that [the plaintiff] was capable of litigating her claims." 64 F.3d at 289.

serious medical need and that the defendants consciously disregarded that need so as to impose cruel and unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994); *Higgins v. Corr. Med. Servs. of Ill., Inc.*, 178 F.3d 508, 511 (7th Cir. 1999). At the time the district court denied each of Johnson's three requests for counsel, Johnson displayed the necessary competence to present a basic, adequate case. When the district court denied Johnson's first request for counsel, Johnson had not only filed an acceptable complaint but also had defended his complaint with detailed and well-organized memoranda of law opposing the defendants' motions to dismiss. His memoranda cited and discussed the relevant Supreme Court and Seventh Circuit case law. In *Forbes v. Edgar*, 112 F.3d 262, 264 (7th Cir. 1997), the plaintiff was found to be an "exceptionally able litigant" due to her court papers being "comprehensible and literate." Likewise, in this case, Johnson's court filings were comprehensible and literate. *See id.*; *see also Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000) (plaintiff showed sufficient competence to try his own case simply because "initial complaint specifically referred to both the Eighth and the Fourteenth Amendments, and his motion in opposition to summary judgment competently addressed the key points"); *cf. Gil*, 381 F.3d at 657 (plaintiff's limited English skills and reliance on another inmate to draft his court papers demonstrated an inability to try the case by himself). Moreover, by the time the district court denied Johnson's second request for counsel, Johnson had prevailed against the defendants' motions to dismiss.

In addition, when the district court denied his third request for counsel, Johnson had filed similarly satisfactory memoranda of law concerning summary judgment, *see Weiss*, 230 F.3d at 1034 (quotation above), and had also prevailed against four of the ten defendants at the summary

judgment stage. Further, by that juncture, Johnson had filed a motion to ascertain Dr. Doughty's full name and contact information for service purposes and had won. *Cf. Greeno*, 414 F.3d at 658 (plaintiff's repeated failure to serve defendants with process indicated an inability to try the case by himself). Astutely, Johnson also had filed a motion in limine to restrict the defendants from mentioning his criminal history and prison disciplinary record at trial. (The motion later became moot when the matter was converted from a jury trial to a bench trial.) While Johnson does not appear to have prior litigation experience, *see, e.g.*, *Forbes*, 112 F.3d at 264, that can hardly be a reason to justify reversing a denial of counsel because, if it were, an overwhelming number of *pro se* litigants would become entitled to counsel. Rather, Johnson's able handling of the aforementioned matters in this case—especially his ability to successfully marshal facts and case law to avoid dismissal and partially avoid summary judgment—sufficiently demonstrates that he knew what he had to do to prosecute an adequate case and that he had the ability to do so. *See id.*; *Zarnes*, 64 F.3d at 289 (denial of counsel upheld when the plaintiff "understood the elements of her claims and the legal authority supporting them," "recognized relevant facts," and demonstrated the "ability to investigate the underlying facts" and the "ability to present her claims").

It is important not to overstate the difficulty of this case. In denying Johnson's third request just before trial, the district court reasoned: "The plaintiff can testify to his own pain and restricted activities due to his hernia during his time at Graham, and can cross-examine the defendants regarding their conclusion that he did not need surgery." The district judge (a seasoned jurist with more than twenty-five years of service on the federal bench) correctly recognized that Johnson had the building blocks of a basic,

adequate case at his disposal. Through the examination of the defendants—particularly Dr. McEntyre, the pivotal defendant in the case—under oath, Johnson had the opportunity to elicit evidence about the alleged policy against hernia operations as well as expert testimony on accepted professional standards for treating hernias and hernia pain.[6] Given this opportunity,[7] we cannot say that the lack of counsel amounted to a denial of due process. *See Zarnes*, 64 F.3d at 288. This is certainly not one of those "extreme" cases in which, without a doubt, it is was plainly "impossible" for the plaintiff to obtain "any sort of justice" without counsel. *Farmer*, 990 F.2d at 323.

Assuredly, Johnson's case might have improved had he been represented by counsel. For example, counsel would have been in a better position to conduct a discovery expedition to unearth possible evidence about the alleged policy against hernia operations. Counsel also would have been better able to gather, present, and educe evidence

---

[6] In his appellate brief, Johnson even agrees that Dr. McEntyre was an "available medical expert" for Johnson to use in the presentation of his case. Furthermore, plaintiffs using defendant doctors as experts to establish professional standards is not a novel concept. For instance, under Illinois medical malpractice law, when "expert testimony is required to establish the applicable standard of care, it is well-settled that the testimony of the defendant doctor may suffice to establish the standard." *Rohe v. Shivde*, 560 N.E.2d 1113, 1121 (Ill. App. Ct. 1990) (collecting cases); *see also Los Amigos Supermkt., Inc. v. Metro. Bank & Trust Co.*, 713 N.E.2d 686, 697 (Ill. App. Ct. 1999).

[7] We separately observe that the trial transcript reveals that Johnson seized this opportunity, eliciting sworn testimony about the alleged policy (i.e., that there was none) and the relevant professional standard for treating hernias.

about hernia treatment, hernia pain, accepted professional standards, and the defendants' conduct in response to those issues. In particular, counsel would have been in a better position to secure Johnson's own expert to offer relevant opinion testimony to counter Dr. McEntyre.[8] However, just because counsel might have added opportunities to improve the presentation of Johnson's case does not mean that the case itself was so overly complex that counsel was required. Furthermore, speculating about how counsel might have done a better job prosecuting the case is neither necessary nor appropriate. *See Luttrell*, 129 F.3d at 936 ("Although a good lawyer may have done better than [the plaintiff], that is not the test . . . ."); *Farmer*, 990 F.2d at 323; *but see Greeno*, 414 F.3d at 658 (under the particular facts of the case, medical issues, likely requiring expert testimony, were one among several considerations for requiring counsel under § 1915(e)(1)).

Separately, Johnson, through his appellate counsel, disjointedly attempts to raise two evidentiary arguments within the confines of his argument for counsel. Each argument impermissibly relies on hindsight, i.e., events at trial to attack the district court's pre-trial decisions to deny counsel. *See Hudson*, 148 F.3d at 862-63 n.1. They are therefore meritless in this context. Nonetheless, to be thorough, we briefly address each argument. First, at trial, Johnson asked Dr. McEntyre if hernia surgery was expensive. The district court ruled the question to be irrelevant

---

[8] We note that expert testimony or other evidence merely showing "that some medical professionals would have chosen a different course of treatment [would be] insufficient to make out a constitutional claim." *Collignon*, 163 F.3d at 989 (discussing *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996)).

and Dr. McEntyre did not answer. Any error in this regard was harmless because the district court later permitted Johnson to question Dr. McEntyre about whether he was denied surgery because of some money-saving policy against hernia operations. Earlier in the trial, moreover, Cearlock testified about these cost-related matters.

Second, Johnson complains that the district court discouraged him from examining Drs. Hinderliter and Doughty. Recall that at the close of Dr. McEntyre's testimony, the district court asked Johnson if he could provide any evidence that Dr. Hinderliter did anything other than see Johnson once and refer Johnson to Dr. McEntyre. When Johnson stated that he could not, the district court granted judgment for Dr. Hinderliter before he testified. The district court handled Dr. Doughty in a similar fashion but did examine him to establish a factual record. District courts are afforded broad discretion in matters of trial management. *See, e.g.*, *Southworth v. Bd. of Regents of the Univ. of Wis. Sys.*, 307 F.3d 566, 571 (7th Cir. 2002). Here, the district court was seeking to understand accurately what the facts were, attempting to move the trial along, and dealing patiently with a *pro se* litigant. "[D]istrict courts are allowed, if not encouraged, to 'make the interrogation and presentation effective for the ascertainment of the truth and to avoid needless consumption of time.' " *United States v. Reynolds*, 189 F.3d 521, 529 (7th Cir. 1999) (quoting Fed. R. Evid. 611(a)). By that point in the bench trial, it was clear that Dr. McEntyre was the crucial witness and the other two doctors, due to their limited interaction with Johnson, would have added little or nothing to the case.

Accordingly, given the case's level of difficulty, Johnson—at the time the district court's rulings were made—appeared to be competent to try it himself. *See*

*Farmer*, 990 F.2d at 322-23. Our inquiry about the denial of counsel is therefore at an end. *See id.* The district court did not abuse its discretion in denying Johnson's requests for counsel.

**B.**

We next turn to the grant of summary judgment in favor of six of the defendants. We review summary judgment decisions de novo, construing all facts in favor of the non-moving party. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In short, summary judgment is warranted "if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003) (internal quotation omitted).

The Supreme Court has interpreted the Eighth Amendment's proscription against cruel and unusual punishment as imposing a duty upon the States, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate this proscription "when they display

'deliberate indifference to serious medical needs of prisoners.' " *Greeno*, 414 F.3d at 652-53 (quoting *Estelle*, 429 U.S. at 104). Our focus here is not centered on the objective seriousness of the need (the district court ruled in Johnson's favor in that point) but on whether the defendants acted with deliberate indifference, which is a subjective standard. *See Boyce*, 314 F.3d at 889. To be deliberately indifferent, the defendants must have acted with "a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834). They must know of the serious risk to the prisoner's health, i.e., the serious medical need at issue, and they must also consciously disregard that risk/need so as to inflict cruel and unusual punishment upon the prisoner. *Farmer*, 511 U.S. at 837-38; *Higgins*, 178 F.3d at 511.

We begin our summary judgment review with Curll, a grievance counselor at Graham. Curll received a grievance from Johnson in May 2000 (i.e., before Johnson's first visit with Dr. McEntyre), complaining about his hernia pain and treatment. Curll, who is not a medical professional, researched Johnson's complaint and learned that Dr. Hinderliter had seen Johnson, diagnosed him as having a reducible hernia, and determined that surgery was not required. Curll, according to his affidavit, also learned that Johnson was "told that should his condition change, he should return to the medical unit." Based upon this information, Curll recommended to the warden that the grievance be denied.

Curll's conduct does not demonstrate a sufficiently culpable state of mind. The necessity of surgery was not obvious, *see Higgins*, 178 F.3d at 511, and Curll, not a medical professional, did not know whether Johnson's condition required surgery. However, he was aware of

Johnson's complaints of pain. *See Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997) ("delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims"). Nevertheless, Curll did not disregard Johnson's complaints. He investigated the situation, made sure that the medical staff was monitoring and addressing the problem, and reasonably deferred to the medical professionals' opinions. *See Greeno*, 414 F.3d at 656 ("Perhaps it would be a different matter if [the non-medical prison official] had ignored [the plaintiff's] complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address [the plaintiff's] concerns.") (citing *Hernandez v. Keane*, 341 F.3d 137, 148 (2d Cir. 2003); *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)); *see also Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004);[9] *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D.

---

[9] The Third Circuit's analysis on this point bears repeating here:

> If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. . . . Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

(continued...)

Ill. 2002) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals."). Curll is thus insulated from liability because he "responded reasonably" to Johnson's complaint. *Jackson*, 300 F.3d at 765 (quoting *Farmer*, 511 U.S. at 843).

Romero, the warden, is likewise entitled to summary judgment. Romero, who is also not a medical professional, received Curll's report along with Johnson's grievance. Romero concurred in Curll's recommendation because Johnson had been evaluated by a doctor and was receiving medical care for the grieved condition. Like Curll, Romero did not know whether Johnson required surgery, but he was aware of Johnson's complaints of pain and made sure that medical care was available to Johnson so that qualified medical professionals could determine if Johnson did indeed need surgery. This is not a case, as Johnson claims, of woefully inadequate action evincing a sufficiently culpable state of mind. *See Hudson*, 148 F.3d at 863. Under the circumstances, Romero reasonably relied on the expertise of the medical professionals and, like Curll, did not act with deliberate indifference toward Johnson. *See Greeno*, 414 F.3d at 656; *Spruill*, 372 F.3d at 236; *Jackson*, 300 F.3d at 765; *Bond*, 228 F. Supp. 2d at 920.

The grievance was next reviewed on administrative appeal by two officials not at Graham, but IDOC's main office: Radmacher, a member of IDOC's administrative review board, and Snyder, the director of IDOC. Radmacher

_____

(...continued)
*Spruill*, 372 F.3d at 236; *see also Greeno*, 414 F.3d at 656.

and Snyder agreed that Curll and Romero had addressed the situation appropriately and jointly denied the grievance. Radmacher and Snyder knew that Johnson needed medical attention and that medical care was and continued to be available to Johnson. For the reasons already stated with respect to Curll and Romero, Radmacher and Snyder are also entitled to summary judgment. *See Greeno*, 414 F.3d at 656; *Spruill*, 372 F.3d at 236; *Jackson*, 300 F.3d at 765; *Bond*, 228 F. Supp. 2d at 920.

Separately, Johnson also lodged an informal complaint with assistant warden Jones in May 2000. As part of his duties, Jones frequently made rounds of housing units, talking with inmates and fielding questions and concerns. When a medical concern was raised, Jones's practice was to first make sure the prisoner had visited the health care unit. If so, Jones, who is not a medical professional, would then direct the prisoner to address disagreements about medical treatments to the administrators in charge of the health care unit (e.g., Cearlock). During one of Jones's rounds, Johnson informed Jones that he was in pain, that he was having bowel complications, and that Dr. Hinderliter did not recommend hernia surgery. According to Johnson, Jones took down Johnson's information and told Johnson that he would look into the situation and get back to Johnson, but, according to Johnson, Jones never did. On account of a housing transfer, Johnson never saw Jones again.

A non-medical prison official, such as Jones, cannot be held "deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer*, 991 F.2d at 69; *see also Greeno*, 414 F.3d at 656 (following *Durmer*); *Spruill*, 372 F.3d at 236; *Bond*, 228

F. Supp. 2d at 920. Furthermore, the facts, as presented by Johnson, cannot support a finding that Jones had a sufficiently culpable state of mind. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("[W]e are not required to draw every conceivable inference from the record. Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (internal quotation and citations omitted). At most, Jones's apparent failure to get back with Johnson about his informal complaint evinces a negligent handling of the complaint and not deliberate indifference. *See Jackson*, 300 F.3d at 765 ("Evidence that the official acted negligently is insufficient to prove deliberate indifference."). For these reasons, Jones is entitled to summary judgment.

Last, we address assistant warden Greer. After talking with Jones, Johnson requested a meeting with Greer to discuss the situation, and Greer met with him in her office. During the meeting, Greer called Cearlock and inquired about Johnson's course of treatment. Greer learned that the medical consensus was that Johnson did not require surgery. At the conclusion of the meeting, Greer told Johnson that she would get back with him presumably if she learned something new. According to Johnson, he never heard from or saw Greer again due to Greer's departure from Graham. Greer is entitled to summary judgment on two fronts. First, like Curll and others, Greer took Johnson's complaint seriously, investigated the matter, and reasonably relied on the judgment of the medical professionals. *See Greeno*, 414 F.3d at 656; *Spruill*, 372 F.3d at 236; *Jackson*, 300 F.3d at 765; *Bond*, 228 F. Supp. 2d at 920. Second, as to not getting back with Johnson after the meeting, she is entitled to summary judgment for the same reasons discussed with respect to Jones. *See McDonald*, 371 F.3d at 1001; *Jackson*, 300 F.3d at 765; *Durmer*, 991 F.2d at 69.

**C.**

We now turn to the four remaining defendants and the bench trial. Following a bench trial, we review the district court's legal conclusions de novo, but we may only set aside a district court's factual findings if they are "clearly erroneous." Fed. R. Civ. P. 52(a); *see also Thornton v. Brown*, 47 F.3d 194, 196 (7th Cir. 1995). When there are two permissible views of the evidence, the district court's choice between them cannot be clearly erroneous. *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985); *Thornton*, 47 F.3d at 197. As a consequence, if a factual finding is "plausible in light of the record viewed in its entirety," we may not reverse that finding even if we would have decided the matter differently had we been the trier of fact. *Anderson*, 470 U.S. at 574. Moreover, "any reasonable doubts we may harbor should be resolved in favor of the district court's ruling in light of its greater immersion in the case." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 848 (7th Cir. 2005) (internal quotation omitted).

The deliberate indifference standard discussed above applies with equal force here, but, in the context of medical professionals, it is important to emphasize that medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference. *See Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 592 (7th Cir. 1999). Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). It is not enough to show, for instance, that a doctor should have known that surgery was necessary; rather, the doctor must know that surgery was necessary and then consciously disregard that need in order to be held deliberately indifferent. *See Higgins*, 178 F.3d at 511. Nonetheless, "a trier of fact can conclude

that the professional knew of the need from evidence that the serious medical need was obvious." *Collignon*, 163 F.3d at 989; *see also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) ("If the symptoms plainly called for a particular medical treatment—the leg is broken, so it must be set; the person is not breathing, so CPR must be administered—a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983."). Moreover, a medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment. *See Collignon*, 163 F.3d at 989 ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."); *Cole*, 94 F.3d at 261-62 ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.").

It is also important to reiterate that the Eighth Amendment does not require that prisoners receive "unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Hernandez*, 341 F.3d at 144. Rather, they are entitled to only "adequate medical care." *Boyce*, 314 F.3d at 888-89; *see also Forbes*, 112 F.3d at 267 ("Under the Eighth Amendment, [the plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). The cost of treatment alternatives

is a factor in determining what constitutes adequate, minimum-level medical care, *see Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999), but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective, *see Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990). We have summarized the necessary line drawing in this context as follows:

> [N]ot every refusal of medical treatment constitutes cruel and unusual punishment. Medical "need" runs the gamut from a need for an immediate intervention to save the patient's life to the desire for medical treatment of trivial discomforts and cosmetic imperfections that most people ignore. At the top of the range a deliberate refusal to treat is an obvious violation of the Eighth Amendment, and at the bottom of the range a deliberate refusal to treat is obviously not a violation. Where to draw the line between the end points is a question of judgment that does not lend itself to mechanical resolution. It is a matter of determining the civilized minimum of public concern for the health of prisoners, which depends on the particular circumstances of the individual prisoner.

*Ralston*, 167 F.3d at 1161-62 (citations omitted); *see also Snipes*, 95 F.3d at 592 ("[T]he Constitution is not a medical code that mandates specific medical treatment.").

With these principles in mind, we first turn to Dr. McEntyre, the physician who evaluated Johnson on multiple occasions, and the district court's finding that his denials of the requested hernia surgery did not constitute deliberate indifference. The record reveals that there are three types of hernia situations: (1) a hernia that is strangulated, which is a medical emergency mandating surgery; (2) a hernia that is reducible yet so painful or debilitating that surgery is

required; and (3) a hernia that is reducible and, given the dangers and risks inherent in any operation, can be treated through non-surgical means. There is no evidence that Johnson's hernia was strangulated. Dr. McEntyre was thus left to determine whether Johnson's reducible hernia required surgery. At the initial appointment, Dr. McEntyre formed the professional opinion that surgery was not required, and, in Johnson's subsequent visits, Dr. McEntyre did not observe any worsening of the condition that would make surgery a medical necessity. As to Johnson's theory that IDOC had a cost-saving policy against operating on all reducible hernias whatever the amount of pain or difficulty they cause, Dr. McEntyre flatly denied, under oath, the existence of any such policy. The record shows rather that Dr. McEntyre factored Johnson's pain into his treatment decisions and, given his findings, he prescribed non-surgical remedies designed to alleviate Johnson's pain. *See Gutierrez*, 111 F.3d at 1371. The record therefore indicates that Dr. McEntyre's treatment of Johnson was grounded in professional judgment, *see Collignon*, 163 F.3d at 989; *Cole*, 94 F.3d at 261-62, and that Johnson was afforded adequate, reasonable medical treatment, *see Boyce*, 314 F.3d at 888-89; *Forbes*, 112 F.3d at 267. Consequently, as to Dr. McEntyre, the district court's finding of no deliberate indifference is more than plausible and, thus, not clearly erroneous. *See Anderson*, 470 U.S. at 574.

We reach the same conclusion with respect to Drs. Hinderliter and Doughty. Dr. Hinderliter saw Johnson only once, concluded that surgery was not required, prescribed non-surgical means aimed at alleviating Johnson's pain, and referred further discussion of surgery to Dr. McEntyre. Dr. Doughty evaluated Johnson on only one occasion, just two days after Dr. McEntyre first saw Johnson, and reached the same conclusions as Dr.

McEntyre. It is therefore not surprising that Dr. Doughty deferred to Dr. McEntyre and told Johnson to give Dr. McEntyre's instructions a chance to work. Therefore, for all the reasons discussed with respect to Dr. McEntyre, the district court's findings in favor of Drs. Hinderliter and Doughty are not clearly erroneous.

Finally, we reach Cearlock, Graham's health care administrator. Unlike the other prison officials, the district court denied summary judgment for Cearlock because there was a factual dispute as to whether Cearlock, as the health care administrator, was responsible for the doctors' decision not to operate, i.e., whether Cearlock, as a cost-saving measure or policy, directed the doctors not to operate on any reducible hernias no matter how much pain or disruption they caused. At the bench trial, however, Cearlock refuted, under oath, the existence of any such policy in the following, explicit terms:

> As a health care administrator, I can tell you that we don't have a blanket policy that we don't repair hernias. If the symptoms are increasing significantly, if the hernia becomes an acute issue in the opinion of the medical director or a doctor and needs to have surgery on an immediate basis, the surgery can be done.

R.112 at 45-46. Cearlock's testimony indicates that decisions on hernia surgeries are left to the medical professionals who factor the pain and difficulty caused by a hernia into their decision about whether to operate. *See Gutierrez*, 111 F.3d at 1371. Cearlock did say that costs are generally a factor in determining surgical necessity (e.g., IDOC would not pay for an elective face-lift), but that fact is neither inappropriate nor surprising. *See Ralston*, 167 F.3d at 1162 ("[T]he civilized minimum is a function both of objective need and of cost.").

We therefore see no reason to disturb the district court's judgment, *see id.*, that Johnson received adequate medical care at Graham, *see Boyce*, 314 F.3d at 888-89; *Forbes*, 112 F.3d at 267.

Further, when Cearlock met with Johnson to review the situation, Johnson said that his symptoms had been worsening since he last saw Dr. McEntyre; therefore, Cearlock, quite appropriately, scheduled an appointment for Johnson with Dr. McEntyre so that Dr. McEntyre could reassess Johnson's condition. Similar to Curll and others, Cearlock took Johnson's condition seriously, investigated the situation, referred Johnson to a doctor, and reasonably relied on the doctors' professional opinions. *See Greeno*, 414 F.3d at 656; *Spruill*, 372 F.3d at 236; *Jackson*, 300 F.3d at 765; *Bond*, 228 F. Supp. 2d at 920. Consequently, the district court's finding that Cearlock was not deliberately indifferent toward Johnson is not clearly erroneous.

## III.

This is an unfortunate case because Johnson clearly experienced pain from his reducible (not strangulated) hernia. He received rather extensive medical attention, but with each examination (at least five) Dr. McEntyre concluded that an operation was not necessary nor recommended. Appointed counsel would likely have been helpful, especially in pre-trial. But the very experienced district judge who conducted the bench trial was complimentary of Johnson's written submissions, and he was patient and even helpful in guiding Johnson through his examinations of the key witnesses, Dr. McEntyre and Cearlock. Unfortunately for Johnson, the elicited testimony about his treatment and the alleged policy against operating on all reducible hernias did not support his deliberate indifference claims. More-

over, Johnson's own testimony indicated that after he was transferred to Dixon, the doctors there also declined to operate. An extensive effort by an appointed counsel may have uncovered a document or obtained an expert that would refute the testimony of the defendants. But that is very speculative. Johnson had his day in court with a very experienced and accommodating judge. The testimony not only failed to prove any degree of cruel and unusual punishment, but instead disclosed a rather thorough monitoring of his medical condition in the relatively short period of time during his last months at Graham. Furthermore, upon his release in March 2005, he still had not had an operation, and he had learned to alleviate the pain.

Thus, the district court did not abuse its discretion in denying Johnson's request for counsel and did not err in rejecting the deliberate indifference claims against these ten defendants. On this record, treating Johnson's hernia through non-surgical means did not constitute cruel and unusual punishment under the Eighth Amendment. We therefore AFFIRM the district court.

RIPPLE, *Circuit Judge*, dissenting. In late April or early May 2000, Van Dyke Johnson discovered a lump in his groin, which eventually was diagnosed as an inguinal hernia. This condition is not an uncommon occurrence. For the male

population worldwide the risk is 27%.[1] Approximately 750,000 surgical repairs are undertaken each year in the United States.[2] While postponement of surgical intervention is possible,[3] in almost all cases, the professionally acceptable procedure is surgical repair.[4] Early surgical intervention prevents the complications of incarceration and strangulation.[5]

Mr. Johnson's hernia caused him many problems. He could not stand up straight for very long without causing pain and throbbing in the area of the hernia. Laughing, coughing and bowel movements also caused pain. He sought treatment from the physicians on staff at Graham Correctional Center where he was then incarcerated; his release was not to occur until 2005, and, understandably, he did not think that he could withstand the pain and discomfort until that time. On May 9, 2000, he was examined by Dr. Don Hinderliter, one of the physician defendants in this action. He diagnosed an inguinal hernia and referred Mr. Johnson to Dr. Robert McEntyre, also a physician defendant in this action. Dr. Hinderliter did not recommend surgery but prescribed a hernia belt.

Dr. McEntyre held the position of Medical Director at Graham at all times relevant to this action. Dr. McEntyre examined Mr. Johnson at least five times between June 2000

---

[1] Andrew Kingsnorth, *Treating Invinal Hernias*, 328 Brit. Med. J. 59 (2004).

[2] *Id*.

[3] *Id*.

[4] Tim Bax, M.D., et al., *Surgical Options in the Management of Groin Hernias*, 59 Am. Fam. Physician 1, 7, 14 (1999).

[5] *Id*.

and August 2000. Dr. McEntyre diagnosed Mr. Johnson with a reducible inguinal hernia: "a protrusion in the left groin area that . . . a doctor or patient is able to push back inside without much difficulty" and that is "not stuck out," as Dr. McEntyre later described it in his trial testimony. R.112 at 58. In Dr. McEntyre's opinion, a reducible hernia would present a "surgical emergency" only if the hernia became "strangulated"—that is, nonreducible and eventually gangrenous. *Id.* Dr. McEntyre testified that "vomiting, high fever, [and a] fast heart beat" would accompany a strangulated hernia. *Id.* Because Mr. Johnson's hernia was not strangulated, Dr. McEntyre instructed him to use a truss, directed him to take Tylenol for pain and Metamucil for bowel discomfort and issued him a low bunk permit.

On June 10, 2000, Mr. Johnson was examined by Dr. Stephen Doughty, another physician defendant in this action, who instructed Mr. Johnson to use Tylenol, Metamucil and a truss and to avoid heavy lifting and strenuous activities. Mr. Johnson claims that he also made personal appeals for more effective treatment to IDOC defendants Alex Jones and Billie Greer, who were both assistant wardens at Graham. Neither Mr. Jones nor Ms. Greer testified to a memory of speaking with Mr. Johnson.

Mr. Johnson also pursued relief through the Graham prison grievance procedures. He filed his first grievance on May 16, 2000. On the grievance form, he included a substantial description of his pain, and he attached a photocopied excerpt from "The New Good Housekeeping Family Health and Medical Guide," which indicated that "the best treatment for a hernia is a surgical operation designed to replace the herniated contents into the abdominal cavity and repair the defect in the abdominal wall." R.7, Ex.A at 3, 8. The photocopied excerpt also noted that

"[i]nguinal hernias should always be repaired by surgery."
*Id*. at 8.

IDOC defendant Steve Currl, a correctional counselor assigned to handle inmate grievances, forwarded Mr. Johnson's grievance to the medical unit, which reported that Mr. Johnson had received adequate care. Mr. Currl then forwarded to the warden his recommendation that the grievance be denied. IDOC defendant Gilberto Romero, Graham's assistant warden in charge of operations, agreed that Mr. Johnson's grievance should be denied. IDOC defendant Robert Radmacher, chair of IDOC's Office of Inmate Issues, denied Mr. Johnson's grievance on June 21, 2000, with IDOC defendant Donald Snyder, the Director of IDOC, concurring in this decision.

Mr. Johnson filed a second grievance related to the hernia on July 11, 2000. He also contended that IDOC defendant John Cearlock, a registered nurse who held the title of Health Care Unit Administrator at Graham, had not interviewed him regarding his first grievance. Mr. Johnson eventually met with Mr. Cearlock, who reviewed Mr. Johnson's medical history, scheduled another doctor's appointment for him and recommended that he continue the recommended treatment.

## A.

### The Task Facing Mr. Johnson

In order to appreciate the task that lay before Mr. Johnson as he tried to present his case to the district court, we ought to pause for a moment and recall just how difficult it is to establish an Eighth Amendment claim of this sort.

First of all, there can be no question that the Eighth Amendment's prohibition against cruel and unusual

punishment imposes a duty on state prison officials to provide adequate medical care to incarcerated persons. The reason for this prohibition is straightforward: "[D]enial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). Given this purpose, "delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims." *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997).

Although the Eighth Amendment affords prisoners relief for the unnecessary infliction of pain at the hands of those who have an obligation to provide for their medical needs, it is well-understood that our jurisprudence sets a high bar for a prisoner accusing prison officials of such a violation. The Eighth Amendment is not a medical malpractice statute. Indeed, the Supreme Court has written that a prison official will not be held liable for an Eighth Amendment violation unless he "knows of and disregards . . . a substantial risk of serious harm" to an inmate. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In the context of a claim that he was denied adequate medical care, an inmate can prove an Eighth Amendment violation only by "establish[ing] that: (1) his condition was objectively serious, and (2) state officials acted 'with deliberate indifference to his medical needs, which is a subjective standard.'" *Boyce*, 314 F.3d at 889 (quoting *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)); *see also Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996). Indeed, one of our cases has said that, at times, "the illness or injury must be sufficiently serious or painful to make the refusal of assistance uncivilized." *Cooper*, 97 F.3d at 916.

Setting forth the applicable principles of law is a great deal easier than proving them. "Whether a prison official

acted with deliberate indifference presents a question of fact." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000), and the gathering and presentation of those facts is a most difficult task. Here, Mr. Johnson's task was compounded by the fact that, in order to prove the requisite deliberate indifference, Mr. Johnson had to demonstrate that the positions taken by the prison physicians in their assessment of how to deal with his injury were wrong, that the physicians knew they were wrong and that they nevertheless continued to maintain such a position knowing that their failure to treat the injury properly was the cause of Mr. Johnson's severe pain.

It is important to note that the subjective prong of the test looks at a defendant's actual state of mind. Mr. Johnson therefore had to prove that the defendant was "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837. He had to show: "(1) that the professional knew of the serious medical need, and (2) disregarded that need." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). Notably, "[i]t is not enough that [the official] 'should have known' of the risk"—the official must know of the risk, in this context, a serious medical need. *Higgins v. Corr. Med. Serv. of Illinois*, 178 F.3d 508, 511 (7th Cir. 1999).

As a practical matter, to meet this heavy burden, Mr. Johnson had to establish the requisite subjective intent by demonstrating that the seriousness of his condition would be obvious to the trained professional. *See Collignon*, 163 F.3d at 989 ("A trier of fact can conclude that the professional knew of the need from evidence that the serious medical need was obvious."). He then had to prove that, after becoming aware of a prisoner's serious

medical need, the physician had "consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997). To shoulder this latter burden, Mr. Johnson had to show that the physician had not responded reasonably to his condition. *See Farmer*, 511 U.S. at 843. This task is not fulfilled by simply showing that the physician was negligent. *See Sherrod*, 223 F.3d at 611-12.[6] Indeed, this court has described the circumstances in which deliberate indifference may be inferred from a medical professional's faulty treatment decision in the following way:

> [D]eliberate indifference may be inferred based on a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.

*Estate of Cole*, 94 F.3d at 261-62; *see also Collignon*, 163 F.3d at 989 ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.").

---

[6] A medical professional may evidence deliberate indifference through his treatment decisions. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). However, the deliberate indifference standard is more exacting than the standard for showing medical malpractice. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("Mere negligence or even gross negligence does not constitute deliberate indifference.").

Mr. Johnson sought to meet this demand for proof by establishing that the decision to deny him surgical relief was the product, at least in large part, of a decision somewhere in the Department of Corrections not to spend money on such a procedure. The Eighth Amendment does limit, to some extent, prison officials' discretion to choose less effective or less expensive treatments. We have held that "the civilized minimum of public concern for the health of prisoners" is, in part, "a function . . . of cost": "The lower the cost [of treatment], the less [objective] need has to be shown" to evidence deliberate indifference from the failure to treat a painful condition. *Ralston v. McGovern*, 167 F.3d 1160, 1161-62 (7th Cir. 1999). A plaintiff also may prevail on a claim of deliberate indifference "if he can prove that [officials] deliberately gave him a certain kind of treatment knowing that it was ineffective, either as a means of toying with him or as a way of choosing 'the easier and less efficacious treatment.' " *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990) (quoting *Estelle*, 429 U.S. at 104 n.10). However, the task of ascertaining whether such a decision had been made, by whom, and whether it was an operative factor in his case was, to put it mildly, a formidable one.

### B.

### The Conventional Wisdom

This court, and, indeed, all of the federal courts, are swamped with Eighth Amendment cases alleging that the absence of adequate medical treatment constituted cruel and unusual punishment. Applying the standards set forth above, we have the task of identifying the few cases that are meritorious. This process is a burdensome one for our colleagues in the district court and, to a lesser

degree, for the members of this court. It is, however, a task that Congress has given us and that we must perform willingly if we are to be true to our oaths to do justice without respect to persons, to the rich and the poor alike. *See* 28 U.S.C. § 453. Indeed, Congress, in the Prison Litigation Reform Act, 42 U.S.C. § 1997e, has given the district courts a variety of procedural devices to assist in the screening task. Nevertheless, it is safe to say that the management of these cases continues to be a burden on judicial resources and the conventional wisdom is that the task is akin to looking for the proverbial needle in a haystack.

There also appears to be conventional wisdom about the appointment of counsel in civil cases. That conventional wisdom holds that district courts ought to be parsimonious in the appointment of counsel in such cases, especially in prisoner cases. This mind-set is no doubt rooted in the case law which, to a significant extent, makes clear that prisoners enjoy no constitutional or statutory right to counsel in civil cases. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18 (1981) (holding that the constitutional right to counsel exists only when the loss of liberty is threatened); *Jackson v. County of McLean*, 953 F.2d 1070, 1071 (7th Cir. 1992); *Caruth v. Pinkney*, 683 F.2d 1044, 1048 (7th Cir. 1982). Rather, appointment of counsel "rests in the sound discretion of the district court unless denial would result in fundamental unfairness impinging on due process rights." *Heidelberg v. Hammer*, 577 F.2d 429, 531 (7th Cir. 1978). Indeed, the power to appoint counsel in a civil proceeding derives § 1915(e)(1), from the statutory language which authorizes a district court, upon motion, to "*request* an attorney to represent any person [claiming in forma pauperis status] unable to employ

counsel." 28 U.S.C. § 1915(e)(1) (emphasis added).[7] Notably, however, the case law, when read carefully, also makes clear that this discretion has significant limitations. We have noted that "discretionary choices 'are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Ekanem v. Health & Hosp. Corp.*, 589 F.2d 316, 319 (7th Cir. 1978) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975)). Indeed, to guide the discretion of district courts in deciding motions to appoint counsel to indigent civil litigants, we have set forth five nonexclusive factors: (1) the merits of the indigent litigant's claim (whether the claim is colorable); (2) the nature of the factual issues raised in the claim and whether the plaintiff is in a position to investigate crucial facts; (3) the presence of conflicting testimony and the need for cross-examination; (4) the factual and legal complexity of the issues; and (5) the capability of the indigent litigant to present the case. *Maclin v. Freake*, 650 F.2d 885, 887-89 (7th Cir. 1981).

Even here, however, our case law has contributed to the conventional wisdom by emphasizing that the plaintiff bears a "high burden" in establishing entitlement to counsel under the *Maclin* factors. *Barnhill v. Doiron*, 958 F.2d 200, 202 (7th Cir. 1992).

When faced with a case such as the one before us, a judge must confront this conventional wisdom and question whether the "givens" that seem to dominate our thinking justify our almost Pavlovian responses to such motions. No

---

[7] For a general discussion of the appointment of counsel to indigent plaintiffs in § 1983 actions, *see* 15 Am. Jur. 2d *Civil Rights* § 131 (2005); *see also* Howard B. Eisenberg, *Rethinking Prisoner Civil Rights Cases and the Provision of Counsel*, 17 S. Ill. U. L.J. 417 (1993).

one can question seriously the established principle that there is no right to counsel in civil cases. Nor can anyone question seriously that counsel is not required in the vast majority of prisoner cases. We must examine, however, whether counsel is denied in too many cases and whether that denial deprives litigants of justice in a significant number of cases or at the very least complicates unnecessarily the judicial task.

The statute makes it clear that the district court may only request that counsel accept appointment. *See* 28 U.S.C. § 1915(e)(1). It is sometimes suggested that this is a request that should not be made often of counsel because it is a burden on the practicing bar. No doubt a district court, in determining whether to appoint counsel, ought to take into consideration the burden placed on counsel. It must be remembered as well, however, that attorneys, by virtue of their licenses, have a government-controlled monopoly on the practice of law and, in return for that monopoly, ought to expect to be called to render public service with some frequency. Similarly, although it is often said that it is difficult to find attorneys to take these cases, a district court is certainly not without the resources to ascertain the availability of counsel. Oftentimes, the shopworn argument that, if the case has any merit, "market forces" will induce counsel to take the case is cited as justification for not making an appointment. Prisoners, however, are rarely in a situation that permits them to make a sufficient segment of the bar aware of their case. Indeed, few prisoners are able to explain adequately the merits of the case to an attorney considering undertaking such representation. It is also suggested frequently that there simply are not attorneys willing to take a prisoner case. The presence of counsel in this case on appeal belies that

suggestion—as does the long list of counsel who regularly take such cases.

If counsel are available and willing to perform this public service, why are they not called upon more frequently? Is there a fear that counsel's presence will unduly complicate the case? Or is there an apprehension that counsel will make the case more burdensome on the state officials? Certainly such considerations, *if* they lurk beneath the surface of a decision not to appoint counsel, are entirely inappropriate and underestimate both the skill and dedication of the bar and the capacity of the district court to keep a case on track.

### C.

Now that we have assessed the burden shouldered by Mr. Johnson and the conventional wisdom that surrounded his request for counsel, we can turn to an analysis of the issue before the court today.

Rulings on motions to appoint counsel are reviewed for "abuse of discretion." *See, e.g.*, *McNeil v. Lowney*, 831 F.2d 1368, 1371 (7th Cir. 1987). The term "abuse of discretion" is rhetorically potent and some of the formulations that are employed to give it meaning are equally sharp. To say that we should reverse under the abuse-of-discretion standard only when no rational person could agree with the district court's ruling[8] is poetic—and misleading. To say that reversal is warranted when the district court selected a

---

[8]  *Hastert v. Illinois State Bd. Election Comm'rs*, 28 F.3d 1430, 1442 (7th Cir. 1993) ("We must bear clearly in mind that there can be no abuse of discretion if any rational person could agree with the conclusion of the district court.").

course of proceeding that, under the circumstances one would not have expected a jurist to choose is perhaps better, although still imperfect.[9] Fortunately, we have refined the test in the context to appointment of counsel cases and ask whether "[G]iven the difficulty of the case, did the plaintiff appear to be competent to try it himself and, if not, would the presence of counsel have made a difference in the outcome?" *Farmer v. Haas*, 990 F.2d 319, 322 (7th Cir. 1993).[10]

---

[9] *United States v. Allison*, 120 F.3d 71, 74 (7th Cir. 1997) ("Under this deferential standard, we ask whether the district court made a decision that was within the range of options from which we might expect a reasonable trial jurist to choose under the circumstances.").

[10] In *Farmer v. Haas*, this court noted that the inquiry into whether counsel should have been appointed should not have been framed in terms as complex as those contained in the test this court previously had used. *See Farmer v. Haas*, 990 F.2d 319, 322 (7th Cir. 1993). The previously-used test, as set out in *Maclin v. Freake*, 650 F.2d 885 (7th Cir. 1981), instructed courts to look at five non-exclusive factors in order to determine whether to exercise the discretion to request counsel: (1) "the merits of the indigent litigant's claim," for "[e]ven where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim"; (2) "the nature of the factual issues raised in the claim," along with the question of whether "the indigent is in [a] position to investigate crucial facts"; (3) whether the existence of conflicting testimony as a significant source of evidence makes it "more likely that the truth will be exposed where both sides are represented by those trained in the presentation of evidence and in cross-examination"; (4) "the capability of the indigent litigant to present the case"; and (5) "the complexity of the legal issues raised by the complaint." *Id.* at 887-88. Under the *Maclin* test, "[t]he first factor, the merits
(continued...)

In other words, we shall reverse a district court's refusal to appoint counsel "if, given the difficulty of the case and the litigant's ability, [he] could not obtain justice without an attorney, [he] could not obtain a lawyer on [his] own, and [he] would have had a reasonable chance of winning with a lawyer at [his] side." *Forbes v. Edgar*, 112 F.3d 262, 264 (7th Cir. 1997).[11] As this standard makes clear, "we evaluate the

---

[10] (...continued)
of the plaintiff's claim, [was] foremost." *Swofford v. Mandrell*, 969 F.2d 547, 551 (7th Cir. 1992).

This court in *Farmer* recognized that "the *Maclin* test is not canonical" and, as just described above, presented a stripped-down formulation for the inquiry into whether counsel should have been requested. *Farmer*, 990 F.2d at 321. The *Farmer* test has been recognized as "an alternative, easier method for deciding [appointment of counsel] motions." *Zarnes v. Rhodes*, 64 F.3d 285, 288 (7th Cir. 1995). However, *Farmer* did not discredit entirely the *Maclin* test; it merely noted that "the multiple factors . . . collapse upon inspection" into a simpler inquiry. *Farmer*, 990 F.2d at 321.

[11] In past opinions, we also have directed courts to conduct "a threshold examination into an indigent's effort to retain counsel," on the ground that the enabling statute "dictates that an indigent must have made an unsuccessful attempt to obtain counsel before the request can be considered." *Jackson v. County of McLean*, 953 F.2d 1070, 1072 (7th Cir. 1992). At the time *Jackson* was decided, the statute permitting a court to request counsel to represent an indigent defendant read as follows: "The court may request an attorney to represent any . . . person unable to *employ* counsel . . . ." 28 U.S.C. § 1915(d) (emphasis added). The statute at the time of Mr. Johnson's motions used the language, "unable to *afford* counsel." 28 U.S.C. § 1915(e)(1) (emphasis added). Regardless of the change to the statute, the
(continued...)

reasonableness of the district court's decision [whether to request counsel] as of the time it was made . . . ." *Hudson v. McHugh*, 148 F.3d 859, 862 n.1 (7th Cir. 1998).

In my view, the district court selected a course of proceeding that was clearly inappropriate. It did not take into consideration all the factors that it should have and it gave inappropriate weight to the factors that it did consider. In short, it accepted the conventional wisdom about prisoner medical suits and the conventional wisdom about the appointment of counsel in a case in which it should have "thought out of the box" and declined to accept that conventional wisdom.

Mr. Johnson claims that the complexity of the Eighth Amendment deliberate indifference standard and the medical issues presented by his case should have demonstrated to the district court that he needed the assistance of counsel to prove the subjective intent element of deliberate indifference. He submits that an attorney well-versed in the law of evidence would have been able to have supplied the district court with extensive evidence supporting his claim for relief. It also is Mr. Johnson's position that, in addition to an attorney at trial, he needed a lawyer to conduct the sort of discovery that was necessary both on the significance of the medical evidence and on the possible existence of a prison policy against ever permitting surgery for a hernia.

The defendants, on the other hand, contend that the district court acted within its discretion in refusing to

---

[11] (...continued)
record reveals that Mr. Johnson made numerous efforts to secure the assistance of counsel on his own.

request counsel to represent Mr. Johnson. The defendants point to the fact that Mr. Johnson survived a motion to dismiss and partially survived summary judgment as proof that he was competent to try the case. The defendants also contend that, even if Mr. Johnson was not capable of trying the case on his own, the appointment of counsel would not have made a difference because his claims are without merit.

With respect to the difficulty of the case, the issues presented by Mr. Johnson's deliberate indifference claim were significantly complicated. The Eighth Amendment standards in this context, while well-developed, also are highly dependent on technical medical questions. It was necessary for him to establish that the physicians *knowingly* departed in a substantial way "from accepted professional judgment, practice, or standards." *Cole*, 94 F.3d at 261-62. Given the fact that Mr. Johnson had the burden of proof, the district court should have known that it would not have been sufficient for Mr. Johnson to "testify to his own pain and restricted activities due to his hernia" and to "cross-examine the defendants regarding their conclusion that he did not need surgery." August 25, 2003 Order at 1. The issues were far more complex than that. In order to show that the defendants were deliberately indifferent to his condition, Mr. Johnson in all likelihood would need to introduce evidence of the usual amount of pain suffered by a person with a hernia and of whether his own pain was typical or atypical. *See, e.g., Gutierrez*, 111 F.3d at 1369-71 (holding that failure to treat a chronic, painful condition can rise to the level of an Eighth Amendment violation). He also would have to address the accepted professional standards for treatment of hernias: for instance, the usual treatment, the risks associated with leaving an inguinal hernia un-

treated, whether the treatment prescribed by the physician defendants would have been effective as a long-term solution to Mr. Johnson's problem, and whether a reasonable physician would have treated a patient with the methods prescribed by the physician defendants. It is simply unrealistic to say that Mr. Johnson was going to achieve these litigation goals simply by relying on *his* cross-examination of the defendant physicians.

Mr. Johnson's difficulty in presenting an adequate case about the degree of pain that he claims he experienced is compounded by his further need to establish his claim that the defendants let him suffer that pain despite the availability of cost-effective treatment with an acceptable degree of medical risk. It is his contention that the defendants denied him such treatment, even though it was indicated under accepted professional standards, simply in order to avoid the cost. It is difficult to see how Mr. Johnson was going to establish this claim without engaging in significant discovery. It is even more difficult to imagine that he could have conducted such discovery from his jail cell.

The issues before the district court in this case were not at all "straightforward." On the other hand, the testimony of an expert would have been highly relevant to determining several disputed issues. In fact, in the absence of expert testimony, Mr. Johnson could not have shown that the physician defendants failed to meet the standard of minimal professional competence.

It is clear that Mr. Johnson's skills were inadequate to address the complexities of this Eighth Amendment case without professional help. Mr. Johnson asked for counsel early on in this litigation. As the case progressed, his need for representation became even more obvious—for instance,

at the summary judgment stage, he had not propounded any discovery requests. Mr. Johnson had no "experience litigating other cases." *Forbes*, 112 F.3d at 264. Clearly, Mr. Johnson could not obtain justice without an attorney.

Finally, we must consider whether Mr. Johnson "would have had a reasonable chance of winning with a lawyer at [his] side." *Id.* As the district court recognized in its summary judgment order, the record gave rise to a "reasonable inference . . . that a policy or practice existed [at Graham] . . . that the medical director would not recommend surgery for any reducible hernia, regardless of the pain and difficulty experienced." R.64 at 7. However, as we have discussed above, the quality and quantum of evidence presented at trial in Mr. Johnson's case left much to be desired. This is not a case in which a plaintiff put on a competent case at trial but simply lost fair and square on the merits. *See, e.g., Forbes*, 112 F.3d at 265 ("Most importantly, we are not convinced that the result would have been, nor could have been, different had Forbes had an attorney."). Because Mr. Johnson was not capable of presenting testimony regarding the professional standards of care for a hernia, he did not introduce any evidence of those standards; had the district court been presented with evidence of those standards and evidence that the physician defendants fell far short of those standards, it is clear that Mr. Johnson would have stood a reasonable chance of winning at trial. With the help of competent counsel, he also could have established the liability of the IDOC defendants who were dismissed from the suit at the summary judgment stage. Mr. Johnson had not propounded any discovery at the summary judgment stage; therefore, it is not clear what he would have been able to learn through the discovery process. Certainly, from his jail cell, it would have been impossible to inquire fully of the powers-who-be whether there was a policy

of not performing these procedures despite the resulting long-term pain to the prisoner and despite the significant possibility of complications due to the *indefinite* deferral of surgery simply to save money.

When it came time for appeal, the district court had an opportunity to assess the case in its entirety. It then determined that the complexities of this particular case, which involved presenting the often-elusive issue of pain and the always-difficult issue of examining intent in the context of a bureaucratic process, required the guiding hand of appellate counsel. However, there were sufficient indicators of this complexity, and therefore of this need for counsel, at earlier stages of the proceedings. In light of Mr. Johnson's abilities and the complex legal questions presented by his case, and in light of Mr. Johnson's reasonable chances for success if represented by competent counsel, the district court should have realized, as it apparently did later on, that following the conventional wisdom was inappropriate here. I would reverse the judgment and order a new trial.

A true Copy:

      Teste:


                         _____

                         *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*